FLETCHER, AD. ET AL. VS. POOL.

The act of Congress approved 15th September, 1850, granting to the State the swamp and overflowed lands within her limits, vested in the State, *proprio vigore*, from the day of its date, title to all the land of the particular description therein designated.

The act of the Legislature, approved 11th of January, 1851, was not, in itself, a confirmation of any sales, made by the land officers of the United States, of the swamp and overflowed lands granted to the State. But if the State had received the indemnity mentioned in the act, before any private rights had attached by purchase from her, the receival of the indemnity would be treated, in equity, as a sale to the United States, and the title thus acquired by the United States would enure, by way of estoppel, to her grantee.

*Appeal from Arkansas Circuit Court in Chancery.*

Hon. JOHN C. MURRAY, Circuit Judge.

PIKE & CUMMINS, for the appellants.

YELL, for the appellee.

Mr. Justice COMPTON delivered the opinion of the Court.

This was a bill in chancery, exhibited by *William B. Pool* against Thomas Fletcher, Sarah Clay, Joseph Clay, Mary Clay and Caroline Clay, to quiet title, etc.

The bill charges, in substance, as follows:

That complainant, on the 10th day of January, 1851, entered at the land office of the United States, at Little Rock, the south half of the north-east fractional quarter of fractional section seven, and the north half of the south-west fractional quarter of fractional section eight, in township eight, south of range three west, containing one hundred and sixty acres; and that,

on the 11th day of January, 1851, he also entered, in said land office of the United States, the north half of the south-east quarter of fractional section seven, in the township and range aforesaid—exhibiting with the bill copies of the certificates of entry; that one Joseph W. Clay, after the lands had been entered by complainant, purchased the same with swamp land scrip, at the State land office—well knowing that they had been previously entered by complainant; that they were not then subject to entry as swamp and overflowed lands, and that Clay's entry was illegal and void; that Clay, after his purchase, died leaving him surviving the said *Sarah*, his widow, and the said *Joseph*, *Mary* and *Caroline*, his children and heirs at law, and that said *Thomas Fletcher* was duly appointed administrator of his estate, etc.

The bill further charges that Clay, in his lifetime, and his heirs at law, and administrator, since his death, though not in possession of the lands, have nevertheless, by asserting title thereto, thrown a cloud upon complainant's title, which prevents him from selling or enjoying the lands, as in law he ought to be permitted to do.

After interrogating the defendants especially, as to the date of Clay's purchase at the swamp land office, and as to his knowledge of a previous purchase of the same lands by complainant from the United States, the bill concludes with a prayer that Clay's purchase be declared illegal and void, that defendants be perpetually enjoined from setting up title, etc., and for general relief.

Fletcher demurred to the bill, and stood upon his demurrer. The heirs, being infants, answered by their guardian *ad litem*, reserving the benefit of demurrer on the final hearing, for want of equity.

No testimony having been introduced on the hearing, in support of the answer, only such matters alleged in it, as are directly responsive to material allegations in the bill, and which, for that reason, are to be taken as evidence for the defendants, need be noticed here.

The answer admits that Clay purchased the lands, in the bill mentioned, by entry at the State swamp land office, in 1851, subsequent to the time of purchase of complainant from the United States, alleging at the same time, that they were a part of the swamp and overflowed lands, granted to the State by act of Congress, approved the 25th September, 1850, and as such, were subject to entry at the date of Clay's purchase— insisting that Clay's entry was valid, and that complainant's, though made first, was illegal and void.

Replication to the answer being entered in short upon the record, the cause was heard on bill, answer, exhibits and the demurrer of Fletcher.

Upon the hearing, complainant read in evidence a patent from the United States for a part of the lands mentioned in the bill, and a certificate of entry for the residue. The Court decreed the lands to complainant, and perpetually enjoined defendants from setting up title thereto; and they appealed to this Court.

It appears that this cause proceeded with some irregularity in the Court below, and that the issues discussed are but meagrely and obscurely presented. Enough, however, may be gathered from the record, to enable the Court to pass upon the merits of the controversy: and in so doing, our attention is first called to the act of Congress, approved 28th September, 1850. The first section of the act grants to the State of Arkansas all the swamp and overflowed lands, made thereby unfit for cultivation, within her limits, for certain purposes mentioned in the act. The second section provides that the Secretary of the Interior shall make out an accurate list and plats of the lands described, and transmit the same to the Governor of the State, and at the request of the Governor, cause a patent to be issued to the State therefor; and that on that patent, the fee simple to the lands should vest in the State, subject to the disposal of the Legislature.

That the act was a *present* grant, vesting in the State, *proprio vigore*, from the day of its date, title to all the land of the

particular description therein designated, wanting nothing but the definition of boundaries to make it perfect, no doubt can be entertained. *Rutherford vs. Green's heirs,* 2 *Wheat.* 197; *Opinions of Attorney General* Black, *of 7th June,* 1857, *and* 10*th November,* 1858, (*precisely in point*), *and authorities therein cited, etc.*

The object of the second section, was not to postpone the vestiture of title in the State until a patent should issue, but was to provide for the ascertainment of boundaries, and to prevent a premature interference with the lands by the Sate Legislature before they were so designated as to avoid mistake and confusion. Where land is granted by legislative enactment, and the grantee is authorized to demand a patent for the land, his title is as much vested as if he had the patent, which is but evidence of his title.

It is insisted in argument, that conceding this construction of the act of Congress to be correct, still, the act of the Legislature, approved 11th of January, 1851, was, in itself, a confirmation of complainant's purchase from the United States.

The Court thinks differently. The act provides: " that the board of swamp land commissioners are hereby empowered to demand of, and receive from, the proper accounting officers of the United States, indemnity, at the rate of one dollar and twenty-five cents per acre, for any swamp and overflowed lands within this State, which have been sold or disposed of by the United States, since the 28th day of September, 1850, or which may hereafter be sold, and disposed of by the United States." It is admitted that there are no particular terms necessary to constitute a confirmation, or grant, by the Legislature; (*Enfield vs. Permit,* 5 *New Hamp.* 284; *Rutherford vs. Green's heirs, supra,* 2 *Wheat.* 197;) but where the words employed do not, in themselves, import a confirmation or grant, the intention of the Legislature must be ascertained by construction; and when we apply this rule to the act in question, it will be difficult to arrive at the conclusion that it was intended as a confirmation of the title to swamp and overflowed lands, purchased from the United States after the passage of the act of Congress, approved 28th September, 1850.

The act of January 11th, 1851, not only applies in express terms, to the sales of swamp and overflowed lands made by the United States *before*, but also to sales made *after* its passage. No distinction is made, and it operates on both alike. If it is a confirmation of sales made before, it would likewise be a confirmation of sales made after the passage of the act. Such a construction, therefore, as that contended for, would be legalizing, in advance, an interference by the subordinate land officers of the United States in the sale of lands belonging to the State. Future entries of swamp and overflowed lands, whether made in the land office of the State, or that of the United States, would be of equal validity—thus virtually providing two distinct offices, under different jurisdictions, at which to purchase lands of the State. Great confusion and public inconvenience would be the result. We cannot impute such an intention to the Legislative Department. If the object had been to confirm such sales, language would undoubtedly have been used, far different from that which was employed.

Portions of the swamp and overflowed lands had been sold by the United States, through the inadvertence of her officers, or from an erroneous opinion entertained as to the rights of the State. The purchasers were without title, and the United States had their money. The State had received nothing for her lands, and had not parted with her title. Under these circumstances, the act was passed, which " empowered the swamp land commissioners to demand and receive from the proper accounting officers of the United States indemnity" for the lands so sold. Are we to infer from this provision that the Legislature intended that the State should abandon her title, and take in lieu of it, an indemnity *not received*, and which the United States might, or might not choose to make? Was it intended that the State should grant away her lands by confirmation, to purchasers under the United States, and thus put them beyond her future control, upon such an uncertainty? Surely not. Nothing is said in the act about those purchasers,

or their titles.   The act was not passed for their benefit, and consequently they were left out of view.

The manifest object of the Legislature was to look after the general interest of the State, and endeavor to obtain a valuable consideration for her lands, from the United States: leaving purchasers who had no title, to take care of themselves.   The State granted nothing expressly or impliedly, except the mere authority to her officers to demand and receive the indemnity.

A purchaser, therefore, from the United States, can derive no benefit directly from the act of January 11, 1851, though he may do so indirectly, by showing that the State has received the indemnity mentioned in the act, *provided* no private rights have attached in the meantime, by purchase from the State. For, in such case, the receipt of the indemnity would be treated, in equity, as a sale of the lands by the State to the United States.   *Penson & Harkins vs. Ivey*, 1 *Yerg.* 296; *Thompson vs. Branch*, *Meigs' Rep.* 390; *Padget vs. Lawrence*, 10 *Paige* 170; and the title thus acquired by the United States, would enure by way of estoppel to her grantee.   *Enfield vs. Permit*, 5 *New Hamp.* 285, *supr* ; *Bank of Utica vs. Mersereau*, 3 *Barb. Ch. Rep.* 528; *Commonwealth vs. The Heirs of Andre & Ballou*, 3 *Pick.* 225; *Commonwealth vs. Pejepsicut Proprietors*, 10 *Mass.* 154.

The complainant not having shown title in himself, the decree must be reversed.


Mr. Chief Justice ENGLISH did not sit in this case.