## WRIGHT v. ROSEBERRY.

### ERROR TO THE SUPREME COURT OF THE STATE OF CALIFORNIA.

Submitted March 21, 1887. — Decided May 2, 1887.

The grant of swamp and overflowed lands to the several states by act of September 28, 1850, is one *in præsenti*, passing title to the lands of the character therein described, from its date, and requiring only identification thereof to render such title perfect.

Such identification by the Secretary of the Interior is conclusive against collateral attack as being the judgment of the special tribunal on which such duty was imposed.

On neglect or failure of that officer to make such designation, it is competent for the grantees of the State to identify the lands in any other appropriate mode to prevent their rights from being defeated.

After segregation of the lands by the State, and adoption of the segregation surveys by the proper Federal officers, the right of the State's grantees to maintain an action for recovery thereof cannot be defeated because such lands have not been certified or patented to the State.

The issue of patents for these lands to defendants or their grantors, under the preëmption laws, upon claims initiated subsequent to the swamp grant to the State is not conclusive at law as against parties claiming under such grant, and in an action for their possession evidence is admissible to determine whether or not the lands were in fact swamp and overflowed at the date of the swamp land grant: if proved to have been such, the rights of subsequent claimants under other laws are subordinate thereto.

The provisions contained in § 1 of the act of July 23, 1866, "to quiet land titles in California," do not relate to the swamp lands granted to the State by the act of September 8, 1850 ; the provisions in §§ 4 and 5 relate to swamp lands.

The legislation of Congress respecting swamp lands, the Departmental construction of that legislation, the line of decisions by this court respecting it, and the decisions of the highest courts of many of the states concerning it, stated.

THIS was an action to recover possession of a tract of land situated in the county of Yolo, in the State of California,

consisting, according to the public surveys, of portions of sections 24, 25 and 36 of township 11 north, range 2 east, in that county, and embracing 560 acres. The land was particularly described as follows: The north half of the southeast quarter, and the southeast quarter of the southeast quarter of section twenty-four (24), the east half of the northeast quarter and the southwest quarter of the northeast quarter of section twenty-five (25), the southeast quarter of section twenty-five (25), and the northeast quarter of section thirty-six (36), all in township eleven (11) north, range two (2) east, Mount Diablo base and meridian. It was alleged to be swamp and overflowed land, which was granted to the state by the act of Congress of September 28, 1850, "to enable the state of Arkansas and other states to reclaim the 'Swamp Lands,' within their limits." 9 Stat. 519. The complaint was in the usual form in such actions, alleging the plaintiff's seizin in fee of the land and his right of possession, the unlawful entry thereon of the defendants and their ousting him therefrom, and their continued withholding of the possession to his damage of $1000. It also alleged that the rents and profits of the land were of the value of $560 a year. The prayer was for judgment of restitution of the premises and for the damages, rents and profits claimed.

Two of the defendants united in their answer, one of them being a tenant of the other; the other defendants answered separately. All denied the allegations of the complaint, and, except in the case of the tenant, asserted ownership in fee of portions of the demanded premises, which they described in their respective answers; and all set up the statute of limitations in bar of the action.

The action was twice tried by the state District Court in which it was commenced, and, by stipulation of parties, without a jury. At both trials the plaintiff asserted title to the premises as swamp and overflowed lands by conveyance from parties who had purchased them from the State. The defendants claimed the premises through patents of the United States, issued under the preëmption laws to them or to parties from whom they derived their interest. On the first trial, the

court found that 160 acres were swamp and overflowed land on the 28th of September, 1850, within the meaning of the act of Congress of that date, and gave judgment in favor of the plaintiff for their possession; but, as to the other portions of the premises, the court failed to find whether or not the plaintiff was the owner thereof or entitled to their possession. For this failure the Supreme Court of the state, on appeal, reversed the judgment, and remanded the cause to the District Court, with directions to find upon those issues from the evidence already taken, and such further evidence as might be adduced; and to render judgment upon the whole case. Upon the second trial thus ordered, further testimony was accordingly taken. The court thereupon set aside its previous findings, found on all the issues in favor of the defendants, and gave judgment in their favor. On appeal to the Supreme Court this judgment was affirmed.

*Mr. John Mullan* for plaintiff in error.

*Mr. W. C. Belcher* for defendant in error.

I. Under the act of Congress of September 28, 1850, granting swamp and overflowed lands to the states, the Secretary of the Interior is the officer, and his department the tribunal, to determine what lands are within the grant, and his decision is conclusive. *French* v. *Fyan*, 93 U. S. 169, 171. That decision has been many times recognized and affirmed, and by it the rule was settled that when the Land Department has issued a patent for any given tract of land as high land, and particularly where, as here, it has issued a patent after having made special inquiry and examination, through its subordinate officers, to determine the character of the land with reference to the grant, the question of character is conclusively settled in favor of the patentee, and cannot be reëxamined in an action at law.

Here we have as evidence of the decision of the Department of the Interior as to the character of these lands: First. Patents of the United States to defendants as preëmptors;

Second. Report of the United States Surveyor General of his investigation made upon the application of the plaintiff and the decision of the Commissioner upon that report; Third. Decision of the Commissioner and Secretary of the Interior refusing to list the land to the state upon its application made by the state Surveyor General.

II. In an action of ejectment, patents of the United States for the lands involved are conclusive evidence of the legal title. _French_ v. _Fyan_, 93 U. S. 169; _Johnson_ v. _Towsley_, 13 Wall. 72; _Leese_ v. _Clark_, 18 Cal. 535, 572; _Miller_ v. _Dale_, 44 Cal. 562; _Churchill_ v. _Anderson_, 56 Cal. 55; _Gibson_ v. _Chouteau_, 13 Wall. 92, 102; _Bagnell_ v. _Broderick_, 13 Pet. 436; _Patterson_ v. _Tatum_, 3 Sawyer, 164, 172; _Moore_ v. _Robbins_, 96 U. S. 530; _Cahn_ v. _Barnes_, 7 Sawyer, 48.

In _French_ v. _Fyan_ it appeared that the United States had issued a patent to the state, upon its request, for the land as swamp and overflowed land under the act of September 28, 1850; that Congress had in 1852 made a grant of land to the Missouri Pacific Railroad Company, and the land involved had been surveyed and returned as high land, and had been certified by the Commissioner to the railroad company as part of the land granted to it. The plaintiff claimed under the certificate and grant to the railroad company, the defendants under the state; and the party resisting the patent offered to prove by witnesses that the land was not in fact swamp and overflowed land within the meaning of the act, while in our case the plaintiff sought to prove that the land was swamp and overflowed land within the meaning of the act by witnesses, by the state segregation map, and the new plat constructed by the United States Surveyor General under the fourth section of the act of July 23, 1866.

In _Leese_ v. _Clark_, 18 Cal. 572, Mr. Justice Field, then Chief Justice of the Supreme Court of California, speaking of the conclusive character of a patent, says: "Upon all the matters of fact and law essential to authorize its issuance, it purports absolute verity; _and it can only be vacated and set aside by direct proceedings instituted by the government, or by parties acting in the name and by the authority of the government._

Until thus vacated it is conclusive, not only as between the patentee and the government, but between parties claiming in privity with either by title subsequent." And in *Gibson* v. *Chouteau*, 13 Wall. 102, the same learned judge says: "But in the action of ejectment in the Federal courts, the legal title must prevail, and the patent, when regular on its face, is conclusive evidence of that title. So, also, in the action of ejectment in the state courts, when the question presented is whether the plaintiff or defendant has the superior legal title from the United States, the patent must prevail."

*Miller* v. *Dale*, 44 Cal. 562, was ejectment for land in Santa Clara County. The land was embraced within the calls of two Mexican grants — *Las Animas* and *El Solis* — both of which had been finally confirmed by the proper tribunals of the United States. For *El Solis* a patent had been issued. For *Las Animas* the survey had been finally approved by the United States District and Circuit Courts, but no patent had been issued. The plaintiff, claiming under the *Las Animas*, sought to attack the *El Solis* patent, under which the defendants claimed, on the ground that the confirmation of the grant had been procured by false testimony, but it was held that the patent could not be collaterally attacked, and that it was, so long as it remained unvacated, conclusive against the government and against all parties claiming under the government by title subsequent. The judgment in that case was reviewed in this court, and affirmed in *Miller* v. *Dale*, 92 U. S. 473.

Here the issuing of the patent was, by the act of Congress, made to depend upon the existence of particular facts in reference to the condition of the land — whether it was high land, suited to cultivation, and open to settlement and purchase under the preëmption laws. The Department of the Interior had been appointed to ascertain and determine the facts, and had given its decision, and upon that decision the patents had been issued, and they were not open to collateral attack.

The rights of the defendants were based upon settlements made and declaratory statements filed prior to the passage of the act of July 23, 1866, and their rights were saved by special

provisions of that act. Roseberry's patent for the southeast quarter of section twenty-five was issued prior to the passage of that act.

In *Cahn* v. *Barnes*, decided in 1881, in the United States Circuit Court for the District of Oregon, the plaintiff claimed under a patent from the United States issued under a wagon road grant to the state of Oregon. The defendant claimed under a certificate of purchase from the state, for the land as swamp and overflowed land. The facts in that case were in many respects like the facts in this. There the state had selected the land as swamp and overflowed and issued to the defendant its certificate of purchase, but the land had not been listed or patented to the state as swamp. There too the United States had issued a patent for the land as high land.

The reasoning of the learned judge in that case applies very exactly to this case, and here as there, the patent of the United States must be held conclusive evidence that the lands patented as agricultural lands, were not and are not swamp land.

There the Secretary of the Interior had not been asked to determine the character, and list the lands. Here investigations had been had and reports made at the instance of the state, and after investigation, the Secretary had refused to list or certify the land to the state. The patents were not open to collateral attack. They were issued under authority of law, and by the officers to whom the law intrusted "the issuing of patents for all grants of land under the authority of the government," and for lands the title to which was in the government. If there was any error, it was an error of judgment in the Secretary, in determining the actual character of the land, but that was an error which a court of law cannot correct. The act of July 23, 1866, could not affect the case, because the rights of the defendants were initiated before its passage, and were specially protected by its provisions.

III. There was no error in the rulings of the District Court as to the admissibility of evidence.

*First.* Plaintiff asked the witness Twitchell whether the map filed in the Surveyor General's office, by Mathews, had

been recognized as the segregation map of Yolo County.
Recognition by the officers of the Surveyor General's office
could not give character to the map. The map itself was in
evidence, and was allowed to tell its own story. It was
offered in evidence to show that the land in controversy had
been actually surveyed and segregated as swamp and over-
flowed land by Mathews, as county surveyor, in 1862. It
must speak for itself, and recognition by the Surveyor General
could add nothing to it.

*Second.* The documentary evidence offered by the defend-
ants and admitted against the objections of the plaintiff was
admissible, because it showed that the Land Department and
the Secretary of the Interior, as the head of that department,
had, upon application of the state, refused to list or patent the
land involved to the state.

MR. JUSTICE FIELD, after making the foregoing statement of
the case, delivered the opinion of the court.

It does not distinctly appear what caused the District Court
to change its first decision with respect to those lands, which
it had originally held to be swamp and overflowed; but, as
it admitted in evidence the patents of the United States, and
held that they passed the title to the defendants, it probably
had reached the conclusion which the Supreme Court subse-
quently announced, that the plaintiff could not maintain an
action upon the title to swamp and overflowed lands until
they had been certified as such to the state, pursuant to the
fourth section of the act of Congress of July 23, 1866, "to
quiet land titles in California." For want of such certificate,
the court decided that the title to the demanded premises
never vested in the state, and that she could not convey a title
to the plaintiff upon which he could maintain an action of
ejectment against persons in possession under patents of the
United States. This ruling constitutes the alleged error for
which a reversal is sought. To determine its correctness, it
will be necessary to consider the nature of the grant to the
state of the swamp and overflowed lands, the proceedings

taken under the laws of the state and of the United States to ascertain and define their boundaries, and the effect of the act of July 23, 1866, and of § 2488 of the Revised Statutes as confirmatory of previous segregations by the state. The following is the swamp land act of September 28, 1850:

"AN ACT to enable the State of Arkansas and other States to reclaim the 'Swamp Lands' within their limits.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That to enable the state of Arkansas to construct the necessary levees and drains to reclaim the swamp and overflowed lands therein, the whole of those swamp and overflowed lands made unfit thereby for cultivation, which shall remain unsold at the passage of this act, shall be and the same are hereby granted to said state.

"SEC. 2. *And be it further enacted,* That it shall be the duty of the Secretary of the Interior, as soon as may be practicable after the passage of this act, to make out an accurate list and plats of the lands described, as aforesaid, and transmit the same to the governor of the state of Arkansas, and at the request of said governor, cause a patent to be issued to the state therefor; and on that patent the fee simple to the lands shall vest in the said state of Arkansas, subject to the disposal of the legislature thereof: *Provided, however,* That the proceeds of said lands, whether from sale or by direct appropriation in kind, shall be applied exclusively, as far as necessary, to the purpose of reclaiming said lands by means of the levees and drains aforesaid.

"SEC. 3. *And be it further enacted,* That in making out a list and plats of the land aforesaid, all legal subdivisions, the greater part of which is 'wet and unfit for cultivation,' shall be included in said list and plats; but when the greater part of a subdivision is not of that character, the whole of it shall be excluded therefrom.

"SEC. 4. *And be it further enacted,* That the provisions of this act be extended to, and their benefits be conferred upon, each of the other states of the Union in which such swamp

and overflowed lands, known and designated as aforesaid, may be situated." 9 Stat. 519.

Soon after the passage of this act, the question arose as to the time the grant took effect; whether at the date of the act, or on the issue of the patent to the state upon the request of the governor, after the list and plats of the lands were made out by the Secretary of the Interior and transmitted to him. The question was one of great importance to all the states in which there were swamp and overflowed lands. These lands amounted to many millions of acres. In California alone there were, according to the reports of the Land Department, nearly two millions of acres.

The object of the grant, as stated in the act, was to enable the several states to which it was made, to construct the necessary levees and drains to reclaim the lands; and the act required the proceeds from them, whether from their sale or other disposition, to be used, so far as necessary, exclusively for that purpose. The early reclamation of the lands was of great importance to the states, not only on account of their extraordinary fertility when once reclaimed, but for the reason that until then they were the cause of malarial fevers and diseases in the neighborhood.

The language of the first section of the act indicates a grant *in præsenti* to each state of lands within its limits of the character described. Its words "shall be and are hereby granted" import an immediate transfer of interest, not a promise of a transfer in the future. It was only when the other sections of the act were read that a doubt was raised as to the immediate operation of the act. On the one hand, it was contended that these sections postponed the vesting of title in the state until the lands granted were identified, and a patent of the United States for them was issued. On the other hand, it was insisted that effect must be given to the clear words of the granting clause of the first section, which, *ex vi termini*, import the passing of a present interest, and that, in consistency with them, the other provisions of the act should be regarded as simply providing the mode of identifying the lands, and furnishing documentary evidence of their

identification, and not as a limitation upon vesting the right to them in the state, as this would make the investiture dependent upon the request of the governor, and not upon the act of Congress. It was also urged that identification of the lands could be made in a majority of instances from simple examination of them, and that no policy of the government could be advanced by postponing the passing of the title until the identification by the Secretary of the Interior; and that the clause providing, that upon the issue of the patent the fee should pass, was merely declaratory of the nature of the title, the patent operating merely by way of further assurance.

The question thus brought to the attention of the Department, under whose supervision the act was to be carried into effect, was one upon which men might very well differ, but after its solution had been reached, and the conclusion was acted upon, necessarily affecting titles to immense tracts of land, there should be the clearest evidence of error, as well as the strongest reasons of policy and justice controlling, before a departure from it should be sanctioned.

There are numerous cases in the history of the country where Congress, after confirming to parties title to lands, has directed that patents of the United States should be issued to them; yet, it has been held that the patent in such cases operated merely as record evidence of the title, and added nothing to the title itself. An illustration of this is presented in the case of claims confirmed to lands in the Northwest Territory which originated previously to its cession to the United States. By the act of Congress of March 26, 1804, 2 Stat. 277, c. 35, every person claiming lands within certain designated limits of that territory by virtue of a legal grant made by the French government prior to the Treaty of Paris of the 10th of February, 1763; or by the British government subsequent to that period, and prior to the treaty of peace between the United States and Great Britain on the 3d of September, 1783; or by virtue of any resolution or act of Congress subsequent to that treaty, was required to deliver, on or before the first of January, 1805, to the register of the land office of the district in which the land was situated, a notice stating the

nature and extent of his claim, together with a plat of the tract or tracts claimed. The register of the land office and the receiver of public moneys were constituted commissioners within their respective districts for the purpose of examining the claims. It was made their duty to hear in a summary manner all matters respecting them, to examine witnesses, and to take any testimony that might be adduced before them and decide thereon according to justice and equity, and to transmit a transcript of their decisions in favor of claimants to the Secretary of the Treasury, who was required to lay it before Congress at the ensuing session.

Among the claims presented under this act was one by the heirs of Jean Baptiste Tongas for lands in the neighborhood of Vincennes, the claim being founded upon an ancient grant to their ancestor. The commissioners decided in favor of the heirs and confirmed their claim, and transmitted a transcript of their decision to the Secretary of the Treasury, who laid the same before Congress. By the act of March 3, 1807, 2 Stat. 446, c. 47, this and other decisions in favor of persons claiming lands in the same district of Vincennes, transmitted to the Secretary of the Treasury, were confirmed. The act declared that every person, or his legal representative, whose claim was confirmed, and who had not previously obtained a patent therefor from the governor of the territory northwest of Ohio, or of Indiana Territory, should, whenever his claim was located and surveyed, have a right to receive from the register of the land office at Vincennes a certificate, which should entitle him to a patent for his land, to be issued to him in like manner as is provided by law "for the other lands of the United States." A survey of the tract thus confirmed was made in 1820, but no patent was issued until 1872, when one was issued, reciting the confirmation, by the act of 1807, of the decision of the Commissioners under the act of 1804. The patent purported "to give and grant" to the heirs of Tongas the tract in question in fee. A party claiming under the heirs brought ejectment for the premises. The defendant claimed as tenant under one who had been in actual possession under claim and color of title for thirty years. The

question for decision was, when did the title to the land vest in the heirs of Tongas. The court below held that it vested by the act of confirmation of 1807, when the land was located and surveyed in 1820, and that the patent was not itself the grant of the land by the United States, but merely evidence that a grant had been made to the heirs of Tongas. The defendant, therefore, had judgment. The case being brought to this court, the judgment was affirmed. *Langdeau* v. *Hanes,* 21 Wall. 521. In deciding the case, the court said:

"In the legislation of Congress a patent has a double operation. It is a conveyance by the government when the government has any interest to convey, but where it is issued upon the confirmation of a claim of a previously existing title, it is documentary evidence, having the dignity of a record, of the existence of that title or of such equities respecting the claim as justify its recognition and confirmation. The instrument is not the less efficacious as evidence of previously existing rights because it also embodies words of release or transfer from the government. In the present case the patent would have been of great value to the claimants, as record evidence of the ancient possession and title of their ancestor, and of the recognition and confirmation by the United States, and would have obviated, in any controversies at law respecting the land, the necessity of other proof, and would thus have been to them an instrument of quiet and security. But it would have added nothing to the force of the confirmation. The survey required for the patent was only to secure certainty of description in the instrument, and to inform the government of the quantity reserved to private parties from the domain ceded by Virginia."

The grants by the United States of land to aid in the construction of railroads, in relation to which we have had many cases before us, are in many particulars analogous to the grant by the swamp land act. They are usually of a specified number of sections of land on each side of the proposed route of the road, with a reservation of certain sales or of other disposition made before such road becomes definitely fixed. The usual words of grant in such cases are similar to those in the

swamp land act — "there is hereby granted." Though it is impossible to locate the land granted until the route is fixed, yet when that is fixed the grant takes effect as of the date of the act. This would be equally the case were the mode prescribed to fix the boundaries more complicated and difficult. Thus, in the case of *Leavenworth, Lawrence and Galveston Railroad Company* v. *United States*, 92 U. S. 733, the language was, "There be and is hereby granted to the state of Kansas," and in reference to it the court said: "It creates an immediate interest and does not indicate a purpose to give in future. 'There be and is hereby granted' are words of absolute donation and import a grant *in præsenti*. This court has held that they can have no other meaning, and the Land Department, on this interpretation of them, has uniformly administered every previous similar grant. . . . They vest a present title in the state of Kansas, though a survey of the lands and a location of the road are necessary to give precision to it, and attach it to any particular tract. The grant then becomes certain, and by relation has the same effect upon the selected parcels as if it had specifically described them." See, also, *Railroad Company* v. *Baldwin*, 103 U. S. 426; *Missouri, Kansas and Texas Railway Company* v. *Kansas Pacific Railway Company*, 97 U. S. 491; *Schulenberg* v. *Harriman*, 21 Wall. 44, 60; *Rutherford* v. *Greene's Heirs*, 2 Wheat. 196.

It is plain that the difficulty of identifying the swamp and overflowed lands could not defeat or impair the effect of the granting clause, by whomsoever such identification was required to be made. When identified, the title would become perfect as of the date of the act. The patent would be evidence of such identification and declaratory of the title conveyed. It would establish definitely the extent and boundaries of the swamp and overflowed lands in any township, and thus render it unnecessary to resort to oral evidence on that subject. It would settle what otherwise might always be a mooted point, whether the greater part of any legal subdivision was so wet and unfit for cultivation as to carry the whole subdivision into the list. The determination of the Secretary upon these matters, as shown by the patent, would

be conclusive as against any collateral attacks, he being the officer to whose supervision and control the matter is especially confided. The patent would thus be an invaluable muniment of title and a source of quiet and peace to its possessor. But the right of the state under the first section would not be enlarged by the action of the Secretary, except as to land, not swamp or overflowed, contained in a legal subdivision, as mentioned in the fourth section; nor could it be defeated, in regard to the swamp and overflowed lands, by his refusal to have the required list made out, or the patent issued, notwithstanding the delays and embarrassments which might ensue.

The conclusion which the Land Department reached upon its examination of the character of the grant soon after the passage of the act, was that the title passed to the state at the date of the act. In a communication to the Commissioner of the General Land Office, under date of December 23, 1851, Mr. Stuart, then Secretary of the Interior, referring to the act of 1850 and the act of 1849 to aid Louisiana to drain her swamp lands, and stating that the first question involved was as to the period when the grants took effect — whether at the date of the law, or at the date of the approval of the selections by the Secretary — said: "In each case, the granting clause is in the first section, and the words employed, viz., 'are hereby granted,' seem to me to import a grant *in præsenti*. They confer the right to the land, though other proceedings are necessary to perfect the title. When the selections are made and approved, or the patent issued, the title therefor becomes perfect, and has relation back to the date of the grant." And, further, "As the grants are regarded as taking effect from the date of the laws making them respectively, and as vesting the inchoate title in the states, it follows that any subsequent sale or location of swamp or overflowed lands must be held to be illegal and the purchase money refunded; or a change of location ordered." Lester's Land Laws, 549, No. 578.

This construction of the grant has been followed by the Secretary's successors to this day. In a communication to the Commissioner of the General Land Office, April 19, 1877, Secretary Schurz said: "The legal character of this grant (of

1850) has often been passed upon by the courts, and it has been uniformly held that the act was a present grant, vesting in the state, *proprio vigore* from the day of its date, title to all the land of the particular description therein designated, wanting nothing but the definition of the boundaries to make it perfect." And, therefore, he held that swamp lands were not, in March, 1853, when the preëmption laws were extended to California, public lands, and for that reason could not be entered and sold under those laws. "The act of September 28, 1850," he added, "was notice to the world that all of the swampy lands in California were thereby granted *in præsenti* to the state, and were not subject to preëmption, entry or sale thereafter; and the person who files a declaratory statement on lands actually swampy, does so with full notice that they are not public lands and that he cannot obtain any right thereby." Copp's Public Land Laws, vol. 2, p. 1048.

In a communication to the Commissioner of February 25, 1886, Secretary Lamar said: "The principle has been formerly established by the decisions of the courts and of this Department that the grant of swamp lands made to the several states was a grant *in præsenti*, and conferred a present vested right to such lands as of the date of the grant, and that the field notes of survey may be taken as a basis in determining the character of the land if the state so selects." Decisions of Dept. Interior, vol. 4, 415.

A similar construction of the grant was given by Attorney General Black in an official communication to the Secretary of the Interior, under date of November 10, 1858. In February, 1853, Congress had made a grant of land to the states of Arkansas and Missouri to aid in the construction of a railroad, and under this grant a part of the lands previously granted to the state of Arkansas by the act of September 28, 1850, under the designation of swamp lands, was included; and the question asked of the Attorney General was, which of the two acts gave the better title. In reply, he said: "Where there is a conflict between two titles derived from the same source, either of which would be good if the other were out of the way, the elder one must always prevail; *prior*

*in tempore potior est in jure.* This difficulty, therefore, is solved if the mere grant [of 1850], as you call it, gave the State a right to the land from the day of its date. That it did so there can be no doubt. In an opinion which I sent you on the 7th of June, 1857, concerning one of the same laws now under consideration, I said that a grant by Congress does of itself, *proprio vigore*, pass to the grantee all the estate which the United States had in the subject matter of the grant, except what is expressly excepted. I refer you to that opinion for the reasons and authorities upon which the principle is grounded. It is not necessary that the patent should issue before the title vests in the State under the act of 1850. The act of Congress was itself a present grant, wanting nothing but a definition of boundaries to make it perfect, and to attain that object the Secretary of the Interior was directed to make out an accurate list and plat of the lands and cause a patent to be issued therefor. But when a party is authorized to demand a patent for land his title is vested as much as if he had the patent itself, which is but evidence of his title." 9 Opinions Attorneys General, 254.

The same view of the act as a present grant, vesting in the state from its date the title to all the land within its limits of the particular description designated, wanting only a definition of boundaries to render the title perfect, was taken at an early period by the highest courts of several states within which swamp and overflowed lands existed. It was so held by the Supreme Court of Arkansas in 1859, in *Fletcher* v. *Pool*, 20 Ark. 100; in 1866, in *Branch* v. *Mitchell*, 24 Ark. 431, 444; and in 1874 in *Ringo's Executor* v. *Rotan's Heirs*, 29 Ark. 56.

In *Fletcher* v. *Pool*, the court said: "That the act was a present grant vesting in the State, *proprio vigore*, from the day of its date, title to all the land of the particular description therein designated wanting nothing but the definition of boundaries to make it perfect, no doubts can be entertained. The object of the second section was not to postpone the vestiture of title in the State until a patent should issue, but was to provide for the ascertainment of boundaries and to prevent

a premature interference with the lands by the state legisla-
ture before they were so designated as to avoid mistake and
confusion."

In *Branch* v. *Mitchell*, the court said: "We continue satis-
fied with the decisions heretofore made; and again hold that
all the lands in the state, which were really and in fact swamp
and overflowed, and thereby unfit for cultivation, passed to
and vested in the State, on the 28th of September, 1850. The
case is the same as if the grant had been of all the prairie
land, or all the woodland, or all the alluvial land, in the state;
the difficulty of ascertainment of its character not affecting the
question. The words of grant, the operative words, are direct
and positive: 'Shall be and the same are hereby granted to the
State;' and the provision of the second section, that the Secre-
tary of the Interior should make out and transmit to the gov-
ernor a list and plats of the land described, and at the request
of the governor cause a patent to issue to the State; and that
'on that patent the fee simple to said lands shall vest in the said
State,' can no more be held to limit the effect of the present
grant in the fi.st section, than if, in a deed, after immediate and
express conveyance of lands by some general description, it
should be provided that, when the numbers should be ascer-
tained, another deed should be made, 'on which the fee simple
should vest.' This would make the title of the State to any of
the land depend on the request of the governor for a patent.
The words of the second section must be held to be simply a
definition of the *nature* of the title which the State took under
the grant, and not a postponement of the period at which the
title should vest." 24 Ark. 444, 445.

And in *Ringo's Executor* v. *Rotan's Heirs*, the court held
that the title of the State to the swamp and overflowed lands
granted to her by the act of September 28, 1850, accrued
from the date of the act, and that a title derived from the
State took precedence over a grant by the United States sub-
sequent to that time.

The same view was held by the Supreme Court of Cali-
fornia in 1858, in *Owens* v. *Jackson*, 9 Cal. 322; and in *Sum-
mers* v. *Dickinson*, 9 Cal. 554; and in 1864 in *Kernan* v.

*Griffith*, 27 Cal. 87; and in 1882 was assumed to be the correct view in *Sacramento Valley Reclamation Co.* v. *Cook*, 61 Cal. 341. In the first of these cases, which was an action for the possession of swamp and overflowed lands held under a patent of the State, the defendant demurred to the complaint, on the ground that it did not show that the land had been surveyed and patented to the State. The demurrer was sustained in the court below, but the Supreme Court reversed the decision, holding that the State had the right to dispose of lands of that character granted to her by the act of 1850, prior to the patent of the United States. "The act of Congress," said the court, "describes the land, not by specific boundaries, but by its quality, and is a legislative grant of all the public lands within the state of the quality mentioned. The patent is matter of evidence and description by metes and bounds. The office of the patent is to make the description of the lands definite and conclusive as between the United States and the State." The same conclusion was reached in 1861 by the Supreme Court of Iowa, in *Allison* v. *Halfacre*, 11 Iowa, 450, which was subsequently followed in all its decisions on the subject.

At a later day, the Supreme Courts of Missouri and Oregon held the same doctrine. *Clarkson* v. *Buchanan*, 53 Missouri, 563; *Campbell* v. *Wortman*, 58 Missouri, 258; *Gaston* v. *Stott*, 5 Oregon, 48. The Supreme Court of Illinois, in 1863, expressed the same view in *Supervisors* v. *State's Attorney*, 31 Ill. 68; then receded from it in *Grantham* v. *Atkins*, 63 Ill. 359; and, in 1873, in *Thompson* v. *Prince*, 67 Ill. 281; but returned to its first conclusion, in 1875, in *Keller* v. *Brickey*, 78 Ill. 133.

The question came before this court at the December term, 1869, in *Railroad Company* v. *Smith*, 9 Wall. 95, and the same doctrine as to the character of the grant was affirmed. On the 10th of June, 1852, Congress had made to the State of Missouri a grant of land to aid in the construction of certain railroads, and the legislature of the state had conveyed the land to the Hannibal and St. Joseph Railroad Company. One Smith held certain swamp and overflowed lands, which he

had obtained from the State, and the question presented was whether the grant to the State in aid of the railroads covered the swamp and overflowed lands granted to her by the act of September 28, 1850, the latter not having been certified to the State by the Secretary of the Interior, nor patented to her. After referring to the first section the court said: "Here is a present grant by Congress of certain lands to the States within which they lie, but it is by a description which requires something more than a mere reference to their townships, ranges and sections to identify them, as coming within it. In this respect it is precisely like the railroad grants, which only become certain by the location of the road." And after stating that it was the duty of the Secretary of the Interior to ascertain the character of the lands as swamp and overflowed, and to furnish the State with evidence of it, the court continued: "Must the State lose the land, though clearly swamp land, because that officer has neglected to do this? The right of the State did not depend on his action, but on the act of Congress, and though the States might be embarrassed in the assertion of this right by the delay or failure of the Secretary to ascertain and make out lists of these lands, the right of the states to them could not be defeated by that delay." The court added, that, as the Secretary of the Interior had no satisfactory evidence under his control to enable him to make out these lists, he must, if he attempted it, rely on witnesses whose personal knowledge would enable them to report as to the character of the tracts claimed to be swamp and overflowed; "that the matter to be shown was one of observation and examination, and, whether arising before the Secretary, whose duty it was primarily to decide it, or before the court, whose duty it became because the Secretary had failed to do it, this was clearly the best evidence to be had, and was sufficient for the purpose." And it was held that the grant in aid of the railroads did not include the swamp and overflowed lands.

In *French* v. *Fyan*, 93 U. S. 169, 170, which was before this court at October term, 1876, the same view was taken of the grant, and the effect to be given to a patent of the United

States for swamp lands was stated. That was an action of ejectment for such lands for which a patent had been issued to the State of Missouri under the act of 1850. The lands had been conveyed to the Missouri Pacific Railroad Company by the State as part of the land granted to aid in the construction of its road by the act of June 10, 1862, and the plaintiff had by purchase become vested with the title of the company. To overcome the *prima facie* case made by him the defendant gave in evidence the patent of the State under the swamp land act of 1850, from which he traced title by regular conveyances. The plaintiff then offered to prove by witnesses who had known the character of the land from 1849 down to the time of the trial, that the land was not swamp and overflowed, and made unfit thereby for cultivation, and that, since 1849, the greater part was not, and never had been, in that condition. The court below held that the question was concluded by the patent of the United States to the State for the land as swamp land under the act of September 28, 1850, and rejected the testimony. The admissibility of the testimony was thus presented for determination. In giving our decision we said: "This court has decided more than once that the swamp land act was a grant *in præsenti*, by which the title to those lands passed at once to the State in which they lay, except as to the States admitted into the Union after its passage. The patent, therefore, which is the evidence that the lands contained in it had been identified as swamp lands under that act, relates back and gives certainty to the title of the date of the grant. As that act was passed two years prior to the act granting lands to the State of Missouri for the benefit of the railroad, the defendant had the better title on the face of the papers, notwithstanding the certificate to the railroad company for the same land was issued three years before the patent to the State under the act of 1850. For, while the title under the swamp land act, being a present grant, takes effect as of the date of that act, or of the admission of the State into the Union when this occurred afterwards, there can be no claim of an earlier date than that of the act 1852, two years later, for the inception of the title of the railroad company." And

upon the admissibility of parol testimony to show that the land in the patent was not swamp land, the court said that by the second section of the act the power and duty were conferred upon the Secretary of the Interior, as the head of the department which administered the affairs of the public lands, of determining what lands were of the description granted, and made his office the tribunal whose decision on that subject was to be controlling. The parol evidence, therefore, was held to be inadmissible. 93 U. S. 172.

In commenting upon the case of *Railroad* v. *Smith*, upon which reliance was placed for the admission of the parol testimony, the court said: "The admission was placed expressly on the ground that the Secretary of the Interior had neglected or refused to do his duty; that he had made no selections or lists whatever, and would issue no patents, although many years had elapsed since the passage of the act." — "There was no means," it added, "as this court has decided to compel him to act; and if the party claiming under the State in that case could not be permitted to prove that the land which the State had conveyed to him as swamp land was in fact such, a total failure of justice would occur, and the entire grant of the State might be defeated by this neglect or refusal of the Secretary to do his duty."

This view of the character of the grant was recognized in *Rice* v. *Sioux City and St. Paul Railroad Company*, decided at the October term, 1883, 110 U. S. 695, 697, 698. The question there was, whether the swamp land act extended to territories upon their subsequent admission as states into the Union. It was held that it did not. Said the court, speaking by the Chief Justice: "That the swamp land act of 1850, operated as a grant *in præsenti* to the States then in existence of all the swamp lands in their respective jurisdictions, is well settled," citing the cases of *Railroad Company* v. *Smith*, 9 Wall. 95; *French* v. *Fyan*, 93 U. S. 169, and *Martin* v. *Marks*, 97 U. S. 345. And again: "The grant under the act of 1850 was to Arkansas and the other states of the Union. Arkansas was an existing state, and the grant was to all the states *in præsenti*. It was to operate upon existing things.

and with reference to an existing state of facts." — " It was to take effect at once between an existing grantor and several separate existing grantees."

The result of these decisions is, that the grant of 1850 is one *in præsenti*, passing the title to the lands as of its date, but requiring identification of the lands to render the title perfect; that the action of the Secretary in identifying them is conclusive against collateral attack, as the judgment of a special tribunal to which the determination of the matter is intrusted; but, when that officer has neglected or failed to make the identification, it is competent for the grantees of the State, to prevent their rights from being defeated, to identify the lands in any other appropriate mode which will effect that object. A resort to such mode of identification would also seem to be permissible, where the Secretary declares his inability to certify the lands to the State for any cause other than a consideration of their character.

The legislation of Congress subsequent to the act of 1850, for the purpose of giving it effect, has been in consonance with the view stated of the nature of the grant. It has uniformly recognized the paramount character of the State's title, and has endeavored to correct the evils which in many cases followed from the delay of the Secretary of the Interior in identifying the lands, and furnishing to the State the required lists and plats. The legislatures of the several states in which such lands existed very generally themselves undertook to identify the lands and to dispose of them, and for that purpose passed appropriate legislation for their survey and sale and the issue of patents to the purchasers. Much inconvenience, and in many instances conflicts of title, arose between those claiming under the State and those claiming directly from the United States. To obviate this, on the 2d of March, 1855, Congress passed an act " for the relief of purchasers and locators of swamp and overflowed lands." 10 Stat. 634, c. 147. The act provided that the President of the United States should cause patents to be issued to purchasers and locators who had made entries of the public lands claimed as swamp and overflowed lands with cash or land warrants or scrip, prior to the

issue of patents to states under the act of 1850, "*Provided*, that in all cases where any state through its constituted authorities may have sold or disposed of any tract or tracts of said land to any individual or individuals, prior to the entry, sale or location of the same under the preemption or other laws of the United States, no patent shall be issued by the President for such tract or tracts of land until such state through its constituted authorities shall release its claim thereto, in such form as shall be prescribed by the Secretary of the Interior."

The act also provided " that upon due proof by the authorized agent of the State or States, before the Commissioner of the General Land Office, that any of the lands purchased were swamp lands within the true intent and meaning of the act aforesaid, the purchase money shall be paid over to said State or States; and when the lands have been located by warrant or scrip, the said State or States shall be authorized to locate a quantity of like amount upon any of the public lands subject to entry at one dollar and a quarter per acre, or less, and patents shall issue therefor upon the terms and conditions enumerated in the act aforesaid."

There is here a plain recognition of the prior right of the state to the swamp lands within her limits, by the declaration that no patent of the United States shall be issued to purchasers from them of such lands without a release from the State, and that, in case of completed purchases from them, the purchase money shall be paid to the State, or if the purchase was made by warrant or in scrip, the State may locate an equal quantity of land upon any other public lands subject to entry. By act of March 3, 1857, 11 Stat. 251, c. 117, " to confirm to the several states the swamp and overflowed lands selected under the act of September twenty-eight, eighteen hundred and fifty, and the act of the second March, eighteen hundred and forty-nine," the act of March 2, 1855, was continued in force and extended to all entries and locations of lands claimed as swamp, made since its passage.

The act of Congress of March 12, 1860, 12 Stat. 3, c. 5, extending the provisions of the swamp land act to Minnesota

and Oregon, recognizes in its second section their right and that of other states to make selections of the swamp lands, or rather to provide for their identification, without waiting for the action of the Secretary of the Interior. That section provides that the selection to be made from lands already surveyed in each of the states should be made within two years from the adjournment of the legislature of the state at its next session after the date of the act, and, as to all lands thereafter to be surveyed, within two years from such adjournment at the next session, after notice by the Secretary of the Interior to the governor of the state that the surveys have been completed and confirmed.

By an act passed on the 23d of July, 1866, entitled "An act to quiet land titles in California," 14 Stat. 218, c. 219, Congress changed the provisions of law for the identification of swamp and overflowed lands in that state. It no longer left their identification to the Secretary of the Interior, but provided for such identification by the joint action of the state and Federal authorities.

As early as 1855 the legislature of California undertook to control and dispose of those lands. The Secretary of the Interior had neglected to make out any list and plats of the lands of this character, and to transmit them to the governor of the state, as required by the second section of the act of 1850. The State therefore proceeded, in 1855, to assert her ownership over the lands, by providing for their survey and sale, and the issue of patents to the purchasers. Further legislation was also had on the subject in 1858 and 1859; and, in 1861, an act was passed providing for their reclamation and segregation, making it the duty of the county surveyors to segregate these lands in their respective counties from the high lands, and to make a complete map of the lands in legal subdivisions of sections and parts of sections, and to transmit a duplicate thereof to the surveyor general of the state. Cal. Laws of 1861, 355.

The act of Congress of 23d of July, 1866, was intended to effect the purpose indicated in its title. Previously to its passage there had been great confusion and uncertainty in

relation to land titles in California. This arose with respect to other lands than swamp and overflowed lands, principally from the delay in extending the public surveys of the government, and the action of the state authorities in attempting to select and dispose of the lands granted to her in advance of such surveys. With respect to the swamp and overflowed lands, the confusion had arisen principally from the delay of the Secretary of the Interior in listing such lands to the State, and from inaccuracies of description arising from the want in many parts of the country of the public surveys. The act of July 23, 1866, tended to remove this uncertainty and confusion, principally by recognizing the action of the State in disposing of the lands granted to her, in cases where such disposition was made to parties in good faith, and did not interfere with previously acquired interests, and by providing a mode for identifying the swamp and overflowed lands in the future without the action of the Secretary of the Interior. The first section of the act declared, that in all cases where the State of California had made selections of any portion of the public domain, in part satisfaction of any grant made to her by act of Congress, and had disposed of the same to purchasers in good faith under her laws, the lands so selected should be and were thereby confirmed to the state subject to certain exceptions. This section does not, as supposed by counsel, apply to the swamp and overflowed lands. It was not in satisfaction of a grant of those lands that the State could select lands from any part of the public domain. All she could do was to ascertain where those lands were. She had no power of selection, though that term is sometimes used when merely the power of ascertainment or identification is intended. Secretary Schurz, in *Kile* v. *Tubbs*, July 15, 1879, 6 Copp, 108; Secretary Teller, in *State of California*, December 21, 1883, 2 Decisions of Dep. Int. 643; *Sutton* v. *Fassett*, 51 Cal. 12. It is the fourth section of that act which applies to swamp and overflowed lands. That section, among other things, provides, "That in all cases where township surveys have been, or shall hereafter be, made under authority of the United States, and the plats thereof approved, it shall be the

duty of the Commissioner of the General Land Office to certify over to the state of California, as swamp and over-flowed, all the lands represented as such, upon such approved plats, within one year from the passage of this act, or within one-year from the return and approval of such township plats. The Commissioner shall direct the United States Surveyor General for the state of California to examine the segregation maps and surveys of the swamp and overflowed lands made by said state; and where he shall find them to conform to the system of surveys adopted by the United States, he shall construct and approve township plats accordingly, and forward [them] to the General Land Office for approval." As thus seen, lands represented as swamp and overflowed on the approved plats of township surveys, made under authority of the United States, were, after that date, to be certified to the State; and lands were to be represented as swamp and overflowed on the township plats which were found on the state segregation maps and surveys of such lands; the approval of the township plats to be made by the Land Office.

Under the act of California of 1861, the surveyor of the county of Yolo, in 1862, segregated the swamp and overflowed lands in that county, and made a map thereof, entitled "Supplemental Segregation of Swamp and Over-flowed Land in Yolo County, by Amos Matthews, County Surveyor," on which all the lands in controversy were designated as swamp and overflowed lands, and deposited the same in the state surveyor general's office. A copy of such segregation map, duly certified by the surveyor general of the state, was given in evidence, accompanied with the following certificate of the Surveyor General of the United States:

"U. S. SURVEYOR GENERAL'S OFFICE,

SAN FRANCISCO, CALIFORNIA.

"I hereby certify that this diagram has been compared with the original by me, and that the same is a correct transcript of a plat embracing townships eleven north, range two east; twelve north, two east; twelve north, one east

(fractional), and eleven north, one east, Mount Diablo meridian, said plat having been filed in this office between the 22d of March and 4th of April, 1872, and being plat of survey made by the county surveyor of Yolo County, under and in pursuance of the statutes of the state of California then in force, and showing the segregation lines of the swamp and overflowed land in said townships; and further, that the whole of that portion of said plat is designated thereon as swamp and overflowed land; that I have compared the certificate of approval of said plat with the original indorsed thereon, and that the same is a full, true and correct transcript thereof.

" Witness my hand and the seal of this office this 22d day of September, A.D. 1873.

"[SEAL.]                    J. R. HARDENBURGH,
                    *U. S. Surveyor General California.*"

Objection was taken to a copy of this map, because the one deposited in the office of the surveyor general of the state was not marked as filed. If such was the case, the omission was one of that officer, and could not affect the validity of the map as evidence. It was in proof that the county surveyor deposited the map in that office, and that ever since it had remained there. No other segregation map was ever in the office.

On the first of July, 1861, the swamp and overflowed lands in the county, in controversy in this case, and designated as such on this map, subsequently made, were purchased by different parties from the State, as shown by certificates of purchase issued to them bearing that date, which were produced in evidence. These certificates were assigned to the plaintiff. They are made by statute *prima facie* evidence of legal title in the holders thereof; and upon them ejectment can be maintained for the land described. Act of April 13, 1859; *Richter* v. *Riley*, 22 Cal. 639.

On the 10th of January, 1866, a plat or map of the township, in which the lands in controversy are situated, was

approved by L. Upson, United States surveyor general for California, on which map only one parcel of the lands was designated as swamp and overflowed land. The map showed on its face that the survey of the township was made in the field, in 1864. On the 4th of April, 1872, J. R. Hardenburgh, United States surveyor general for California, who had succeeded Mr. Upson, compared this map with the segregation map of swamp and overflowed lands in the township, made, by the surveyor of the county under the laws of the state, which conform to the system of surveys adopted by the United States, and amended the township plat in accordance with the segregation, and forwarded the same to the General Land Office, where it was officially used as an approved plat. Upon this amended map all the lands in controversy are designated as swamp and overflowed. The following letter of the surveyor general accompanied the map:

" U. S. SURVEYOR GENERAL'S OFFICE,

SAN FRANCISCO, *April* 19, 1872.

" Hon. WILLIS DRUMMOND,

*Commissioner General Land Office, Washington, D. C.*

" SIR: I transmit in a separate roll by to-day's mail certified plats, also certified descriptive lists, of the following townships, showing all tracts which the state of California claimed as swamp and overflowed prior to July 23, 1866; also showing the segregation of swamp and overflowed lands made by the United States, viz.: Township eleven north, range one east; township eleven, north, range two east; township twelve north, range two east, Mount Diablo meridian. The lists of said tracts contain annotations in red ink made by the register of the U. S. Land Office at Marysville, stating all titles to said lands adverse to the claims of the state of California, together with the Register's certificate testifying to the correctness of such annotations, as appears from the records of this office.

" These plats and lists are sent you in accordance with the instructions contained in your letter of July 7, 1871, which in-

closed for my guidance a copy of a letter addressed to L.
Upson, U. S. Surveyor General, dated Sept. 13, 1866.

"Very respectfully, your obedient servant,

"J. R. HARDENBURGH,
*U. S. Surveyor General for California.*"

The Commissioner, Mr. Williamson, who succeeded Mr.
Drummond in office, certifies, under date of January 12, 1878,
to a copy of this plat of township eleven north, range two
east, of Mount Diablo meridian, as one received with the
Surveyor General's letter of April 19, 1872, and "since which
time it has been officially used as approved plat made in
accordance with § 2488, U. S. Revised Statutes." This sec-
tion declares that "it shall be the duty of the Commissioner
of the General Land Office to certify over to the state of
California, as swamp and overflowed lands, all the lands
represented as such upon the approved township surveys and
plats, whether made before or after the 23d day of July,
1866, under the authority of the United States." Subse-
quently, in July, 1877, the state surveyor general forwarded
to the Commissioner of the Land Office certified copies of cer-
tain swamp land surveys, with a statement that the lands de-
scribed in them were all sold by the State in good faith as
swamp and overflowed lands prior to July 23, 1866, and
requested that the lands not already listed, which included
those in controversy, be certified to the State. The Commis-
sioner replied that the lands in the township had all been dis-
posed of, and patents issued to settlers under the laws of the
United States, and upon that ground alone he refused the
application. This refusal was approved by Mr. Schurz, Sec-
retary of the Interior, the latter observing, in justification of
it, that it had been decided by the Supreme Court of the
United States that a patent, when issued and delivered to and
accepted by the grantee, passed the legal title to the land,
and all control of the executive department over it ceased.
"If any lawful reason exists," said the Secretary in his com-
munication to the Commissioner, "why the patent should be
cancelled or annulled, such as fraud on the part of the

grantee, or mistake or misconstruction of the law on the part of your office, the appropriate remedy is by a bill in chancery, and an action may be maintained by the United States, or any contesting claimant, but you are not authorized to reconsider the facts on which a patent was issued, and to recall or rescind it, or to issue one to another party for the same tract," citing *United States* v. *Hughes*, 11 How. 552; *United States* v. *Stone*, 2 Wall. 525; *Hughes* v. *United States*, 4 Wall. 232; and *Moore* v. *Robbins*, 96 U. S. 530. There was no suggestion by either the Commissioner or the Secretary that the lands were not swamp and overflowed as designated upon the township plat.

The question, therefore, is whether upon the proof thus presented of the segregation of the lands in controversy as swamp and overflowed lands by the authorities of the state of California, and their designation as such lands on a plat of the township made by the Surveyor General of the United States, and approved by him, and forwarded to the General Land Office, pursuant to the fourth section of the act of 1866, and approved by the Commissioner, as shown by its official use, the plaintiff can maintain an action for the recovery of the lands, they never having been certified over to the State, as required by § 2488 of the Revised Statutes, or patented to her under the act of 1850. According to the decisions we have cited, the holders of the certificates of purchase had a good title to the lands if in fact they were swamp and overflowed lands on the 28th of September, 1850.

The certificates were conclusive as evidence against the State that they were such lands. The statute of California, as already stated, makes them *prima facie* evidence of legal title to the premises in the holders, and upon them ejectment can be maintained in the state courts. The case of the plaintiff was therefore *prima facie* established by the production of the certificates, and showing their assignment to him. *Richter* v. *Riley*, 22 Cal. 639, cited above.

The representation of the lands as swamp and overflowed on the approved township plat would be conclusive as against the United States that they were such lands, if they had not

been patented before the return of such township plat to the
Land Office. The act of Congress intended that the segrega-
tion maps prepared by authority of the State, and filed in the
state surveyor general's office, if found upon examination by
the United States Surveyor General to be made in accordance
with the public surveys of the General Government, should be
taken as evidence that the lands designated thereon as swamp
and overflowed were such in fact, except where this would
interfere with previously acquired interests. In this case the
defendants trace title by patents of the United States purport-
ing to be issued to settlers under the preëmption laws, in
1866, 1867, 1868, and 1871, upon declaratory statements made
in 1864, three years after the purchase from the State by the
grantors of the plaintiff, and two years after a map segregat-
ing these lands had been made by the surveyor of the county,
pursuant to the law of the state, and deposited in the surveyor
general's office. These patents were evidence that whatever
title the United States then held passed to the patentees, and
as against a mere intruder without claim of title from a para-
mount source, were conclusive that the lands were of the char-
acter which by the patents they were represented to be. This
was the case of *Ehrhardt* v. *Hogaboom*, 115 U. S. 67. There
the plaintiff claimed by a patent issued to his grantor under
the preëmption laws. The defendant admitted he was in pos-
session of twenty acres, and contended that these were swamp
and overflowed lands which passed to the State under the act
of 1850. It appeared, however, that the certificate of pur-
chase, which he produced, did not embrace the lands in con-
troversy, and his offer to prove the character of the land as
swamp and overflowed by parol was rejected. The court
said: "He was, as to the twenty acres, a simple intruder with-
out claim or color of title. He was, therefore, in no position
to call in question the validity of the patent of the United
States for those acres, and require the plaintiff to vindicate
the action of the officers of the Land Department in issuing
it." And again: "It is the duty of the Land Department, of
which the Secretary is the head, to determine whether land
patented to a settler is of the class subject to settlement under

the preëmption laws, and his judgment as to this fact is not open to contestation in an action at law by a mere intruder without title." But this doctrine has no application where a party, whether plaintiff or defendant, asserts title to premises in controversy from a paramount source, or by a prior conveyance from a common source. The doctrine that all presumptions are to be indulged in support of proceedings upon which a patent is issued, and which is not open to collateral attack in an action of ejectment, has no application where it is shown that the land in controversy had, before the initiation of the proceedings upon which the patent was issued, passed from the United States. The previous transfer is a fact which may be established in an action at law as well as in a suit in equity. As we said in *Smelting Co.* v. *Kemp*, 104 U. S. 636, 641: "When we speak of the conclusive presumptions attending a patent for lands, we assume that it was issued in a case where the department had jurisdiction to act and execute it; that is to say, in a case where the lands belonged to the United States and provision had been made by law for their sale. If they never were public property, or had previously been disposed of, or if Congress had made no provision for their sale, or had reserved them, the department would have no jurisdiction to transfer them, and its attempted conveyance of them would be inoperative and void, no matter with what seeming regularity the forms of law may have been observed. The action of the department would, in that event, be like that of any other special tribunal not having jurisdiction of a case which it had assumed to decide. Matters of this kind, disclosing a want of jurisdiction, may be considered by a court of law. In such cases the objection to the patent reaches beyond the action of the special tribunal, and goes to the existence of a subject upon which it was competent to act."

And again, in the same case, we said, p. 646: "A patent may be collaterally impeached in any action, and its operation as a conveyance defeated, by showing that the department had no jurisdiction to dispose of the lands; that is, that the law did not provide for selling them, or that they had been reserved from sale or dedicated to special purposes, or

had been previously transferred to others. In establishing any of these particulars the judgment of the department upon matters properly before it is not assailed, nor is the regularity of its proceedings called into question; but its authority to act at all is denied, and shown never to have existed."

"There are cases," said Chief Justice Marshall, "in which a grant is absolutely void; as where the State has no title to the thing granted, or where the officer had no authority to issue the grant. In such cases the validity of the grant is necessarily examinable at law." *Polk* v. *Wendall*, 9 Cranch, 87, 99. Indeed, it may be said to be common knowledge that patents of the United States for lands which they had previously granted, reserved for sale, or appropriated, are void. *Easton* v. *Salisbury*, 21 How. 426; *Reichart* v. *Felps*, 6 Wall. 160; *Best* v. *Polk*, 18 Wall. 112. It would be a most extraordinary doctrine if the holder of a conveyance of land from a state were precluded from establishing his title simply because the United States may have subsequently conveyed the land to another, and especially from showing that years before, they had granted the property to the state, and thus were without title at the time of their subsequent conveyance. As this court said in *New Orleans* v. *United States*, 10 Pet. 662, 731: "It would be a dangerous doctrine to consider the issuing of a grant as conclusive evidence of right in the power which issued it. On its face it is conclusive, and cannot be controverted; but if the thing granted was not in the grantor, no right passes to the grantee. A grant has been frequently issued by the United States for land which had been previously granted, and the second grant has been held to be inoperative."

The court below held, and placed its decision upon the ground, that, because the Commissioner of the General Land Office had not certified the lands in controversy to the State as swamp and overflowed, when this action was commenced in 1870, there was no title in the state by the grant of 1850 which could be enforced, thus making the investiture of title depend upon the act of the Commissioner instead of the act of Congress; whereas the certificate of that officer, when the

Opinion of the Court.

previous requirements of the law have been complied with, is only an official recognition that the lands are of the character designated, and of the completeness of their segregation. The decision is in conflict with its previous decisions, and with the adjudged cases to which our attention has been called.

In *Sacramento Valley Reclamation Company* v. *Cook*, 61 Cal. 341, decided as late as 1882, that court recognized the swamp land grant of 1850 as one *in præsenti*. Its language was: " It is as well settled as anything can be by the courts that the donation of swamp and overflowed lands by the United States to the states in which such lands were situated at the date of the passage of the act of September 28, 1850, 'was a grant *in præsenti*, by which the title to those lands passed at once to the states in which they lay, except as to states admitted into the Union after its passage,'" citing *French* v. *Fyan*, 93 U. S. 169.

For the error in holding that the certificate of the Commissioner was necessary to pass the title of the demanded premises to the State, the case must go back for a new trial, when the parties will be at liberty to show whether or not the lands in controversy were in fact swamp and overflowed on the day that the swamp land act of 1850 took effect. If they are proved to have been such lands at that date, they were not afterwards subject to preëmption by settlers. They were not afterwards public lands at the disposal of the United States. Parties settling upon such lands must be deemed to have done so with notice of the title of the State, and after the segregation map was deposited with the surveyor general of the state, with notice also that they were actually segregated and claimed by the State as such lands.

*Judgment reversed and cause remanded for further proceedings not inconsistent with this opinion.*