## McCONNAUGHY *v.* WILEY.

*(Circuit Court, D. Oregon.* January 16, 1888 )

1 PUBLIC LANDS—SWAMP LANDS—RIGHTS OF VENDEE.

The vendee of land sold by the state as swamp, the same not having been designated as such by the secretary of the interior, under the swamp-land grant to the state of March 12, 1860, cannot maintain an action to recover the possession of hay cut thereon against one in the actual possession of that portion of the premises on which the hay was cut, for the purpose and with the intention of acquiring the title to the same under the pre-emption acts, as being dry and fit for cultivation.

2 SAME.

A purchaser from the state of land selected by it as swamp, on making the first payment thereon and receiving the receipt or certificate therefor, is entitled, if the land is in fact swamp, or has been so designated by the secretary of the interior, to the possession of the same, and the vegetation growing thereon, and may maintain an action to recover such possession.

*(Syllabus by the Court.)*

Action to Recover Personal Property.

*Rufus Mallory* and *Chas. B. Bellinger,* for plaintiff.

*George H. Williams, George H. Durham,* and *Lewis L. McArthur,* for defendant.

DEADY, J. This action is brought by the plaintiff, [R. F. McConnaughy,] a citizen of California, to recover possession of 200 tons of hay alleged to have been wrongfully cut by the defendant, [J. M. Wiley,] a citizen of Oregon, on the land of the plaintiff. It is alleged in the complaint that the plaintiff is the owner and in possession of a certain 160 acres of swamp land, situated in Lake county, Oregon; and that the defendant, on or about July 6, 1886, wrongfully and with force entered on such land and cut 200 tons of hay thereon, the property of the plaintiff, and took the same and stacked it on the premises, to the damage of the plaintiff, $800. The plaintiff made an affidavit for the immediate delivery of the property, as provided in title 14, Code Civil Proc., in pursuance of which, on December 22, 1886, the marshal took 150 tons of said hay, that being all he could find, and delivered the same to the plaintiff.

The answer of the defendant, filed on January 8, 1887, contains denials of certain material allegations of the complaint, not necessary now to notice, and also a *defense,* which is denominated therein, "a further and separate answer." The defense is to the effect that on May 28, 1885, and since, the defendant was and is qualified to become a settler on the

public lands, under the pre-emption laws of the United States; and that, being so qualified, he, on said day, peaceably entered into the possession of said land, which was then vacant and unsurveyed public land of the United States; that in said year he erected a dwelling-house thereon, in which he has since resided with his family, and has expended about $1,500 in improving the same; that he settled on said land for the purpose of acquiring the title thereto under the pre-emption laws of the United States, as soon as he could, and that he has done all that could be done to obtain such title; and that said hay was cut and stacked on said land by the defendant in 1886, while he was in the possession thereof as aforesaid. The answer also asks judgment for the return of the hay, or the value of the same, $800, with damages for the detention thereof. To this defense the plaintiff replies, and denies that the entry of the defendant was peaceable, or that the land was then vacant and public land of the United States.

On the argument counsel for the defendant made three points against the plaintiff's right to recover the possession of the hay in this action: (1) Admitting the land to be swamp, the plaintiff has neither the title nor the right of possession; (2) admitting that the plaintiff has such title and right, he cannot maintain this action, because the defendant was in the adverse possession of the premises when the hay was cut, and (3) the land is not in fact swamp. From a stipulation filed in the case, it appears that on January 1, 1883, a deed was duly executed by the proper officers, under the statutes applicable to the selection and sale of swamp lands by the state, conveying to the plaintiff certain lands, as swamp; and that on April 3, 1884, a certificate of sale numbered 144 was in like manner issued to Henry C. Owen for 800 acres of land, as swamp, which deed and certificate were "legally sufficient to convey such title as the state could lawfully convey;" that afterwards the plaintiff duly acquired Owen's interest under said certificate in a portion of the lands therein mentioned; that the plaintiff, at all the times mentioned in the pleadings herein, had "all the right and title" in and to said lands which could pass by said deed and certificate; and that the land on which the hay mentioned in the complaint was cut is included in said certificate or deed from the state.

By the act of October 26, 1870, (Sess. Laws 54,) provision was made for the selection and sale, at $1 per acre, of the swamp and overflowed lands granted to the state of Oregon by the act of March 12, 1860. The selection was to be made in the field, under the direction of the governor, who was to have maps of the same filed in the clerk's office of each county where the lands were located, and give public notice thereof. Any person over the age of 21 years, who was a citizen of the United States, or had declared his intention to become such, might apply to the governor to purchase any "tract or tracts" of said land, designating the same by the surveys, and in case there were no surveys, by "artificial or natural landmarks." Within 90 days from the publication of the notice aforesaid the applicant to purchase was required to pay over 20 per centum of the purchase money to the state, for which "a receipt" was

issued to him; and at any time within ten years thereafter, on proof that the land was "drained or otherwise made fit for cultivation," and the payment of the balance of the purchase money on the land actually reclaimed, he is entitled to "a patent for the land so reclaimed;" but where "no such proof of reclamation and payment" is made within said period, the land "shall revert to the state, and the money paid thereon shall be forfeited." A successful cultivation of swamp land for three years "in either grass, cereals, or vegetables, is made by the act a sufficient reclamation.

By the act of October 18, 1878, (Sess. Laws 41,) the swamp lands were still selected under the direction of the governor; but the power to sell was given to the commissioners for the sale of school lands, namely, the governor, secretary, and treasurer of state; and the quantity which any one person might purchase was limited to 320 acres. Section 9 of the act provides:

"All applications for the purchase of swamp * * * lands made previous to the passage of this act, which have not been regularly made in accordance with law, or which were regularly made and the applicants have not fully · complied with all the terms and requirements of the law under which they were made, including the payment of the 20 per centum of the purchase price, are hereby declared void, and of no force and effect whatever."

Section 10 provides that when such applications "have been regularly made" and "fully complied with," the applicant shall, on payment of $2.50 per acre for such lands prior to January 1, 1880, receive a conveyance therefor, "without proof of reclamation," but if he refuses to purchase the entire tract applied for, he shall only be allowed to purchase 320 acres thereof. The "certificate" mentioned in this case is the "receipt" spoken of in the act of 1870. In addition to the mere fact of the payment of the money, it states on what account it was paid, and the general nature and effect of the transaction, measured by the statute under which the purchase and payment were made. The right to insert these matters in the receipt has been questioned, but I do not think the authority of the commissioners was exceeded in so doing. In this way, the receipt is made to show for the benefit of whom it may concern, the nature of the transaction in which the payment is made, and the right and obligation resulting therefrom. Briefly, these two sections of the act of 1878 provide for the forfeiture of the right acquired under the act of 1870, not only for a failure to comply with the conditions subsequent to the sale or issue of "the receipt," but also for a failure to comply with the condition precedent to the right to purchase. These conditions subsequent were the proof of reclamation, and the payment of the balance of the purchase money within 10 years from the payment of the 20 per centum thereof, and the condition precedent was the payment of such per centum within 90 days from the publication of notice by the governor of the filing of the swamp-land maps in the county where the lands were located.

Section 1 of the act of February 16, 1887, (Sess. Laws, 9,) declares void all certificates of sale of swamp lands "on which the 20 per centum

of the purchase price was not paid prior to January 17, 1879;" and section 2 of the act declares forfeited all swamp lands sold under the act of 1870, in case of a failure to comply with the subsequent conditions, as was already done by section 9 of the act of 1878. The first section of this act, if allowed unqualified operation, may be obnoxious to the clause in the national constitution (article 1, § 10) prohibiting a state from passing any "law impairing the obligation of contracts." An applicant for the purchase of swamp lands under the act of 1870 had a contract with the state to that effect, from the time of filing his application. If thereafter he failed to pay the 20 per centum of the purchase price within the time, or under the circumstances prescribed by law, the state might rescind the contract, or treat it as abandoned. But there was no statute prior to the one of 1878 that attached any specifit consequence to such failure, or annulled or rescinded the contract .nerefor. Under these circumstances, if the officers of the state charged with the duty of disposing of these lands accepted the 20 per centum after the day on which it became due and payable, and issued a certificate to the purchaser prior to October 17, 1878, I do not think the legislature could afterwards annul the contract, and declare the certificate void, because the payment was not made on the day appointed. Payment after the day, if accepted, discharges the debt or obligation the same as if paid at the day. *U. S.* v. *Gurney,* 4 Cranch, 333. Again, if an application was made for the purchase of swamp land under the act of 1870, at any time prior to the passage of the act of 1878, and the 20 per centum of the purchase price was paid within 90 days following the publication of the notice of the filing of the map thereof, in the county where the land was located, but owing to the delay in filing said map the payment was not made "prior to January 1, 1879," the legislature could not declare the certificate of sale issued on such payment void and of no effect; for the payment, if made within 90 days after the publication of the notice of the filing of the map, is made within the terms of the contract of purchase with the state, no difference whether made before or after "January 1, 1879."

It does not directly appear under what statute this certificate was issued or deed made. But as it is admitted that they each include more than 320 acres of land, the applications must have been made prior to the act of 1878, and under the act of 1870. As shown by the foregoing exposition of the swamp-land acts, the payments in each case may have been made within the time allowed by law; and, in the absence of evidence to the contrary, the presumption is that they were, and that the certificate and deed were legally issued and made. Until the contrary appears, official duty is presumed to have been regularly performed. Besides, the stipulation in the case admits that the deed and certificate were "legally sufficient to convey such title as the state could lawfully convey," and that the plaintiff has "all the right and title" which thereby passed. Assuming, then, for the time being, that the land described in these writings is swamp, the plaintiff is undoubtedly the legal owner of that described in the deed, and as such, may maintain ejectment, tres-

pass, or replevin, as the case may be. The purchaser, after obtaining his certificate or receipt, is certainly entitled to the possession of the land. Without it, how can he reclaim and cultivate the same, as required by the contract of purchase? In effect, the interest of the state in the land passes to the purchaser, who holds the same subject to the performance of the conditions of reclamation and final payment, on failure of which the statute declares the land "shall *revert* to the state." This, in my judgment, gives the plaintiff such an interest in the land as will enable him to maintain ejectment for the possession, or replevin for hay cut thereon by a trespasser or intruder. It does not appear, however, that the secretary of the interior has ever passed on the question of whether this land is swamp; and therefore the purchaser from the state takes subject to his determination of the question, which is final. But in the mean time, and until the action of the secretary is had in the matter, the purchaser from the state may maintain his right to the possession against any adverse claimant, by showing that the land is in fact swamp, within the intent and purpose of the grant to the state. *Wright* v. *Roseberry*, 121 U. S. 488, 7 Sup. Ct. Rep. 985.

The next question is, can the plaintiff, under the circumstances, maintain this action against the defendant for the recovery of the hay? The rule is stated by Mr. Justice FIELD in *Halleck* v. *Mixer*, 16 Cal. 579, in these words:

"The plaintiff out of possession cannot sue for property severed from the freehold when the defendant is in possession of the premises from which the property was severed, holding them adversely, in good faith, under claim and color of title."

The reason for the rule is, that the personal action of replevin shall not be used as a means of determining the title to real property, as between adverse claims thereto. But a mere intruder or trespasser, who enters on the land of another and cuts hay or other growing thing therefrom, is in no condition to question the title of the owner, so as to defeat an action brought by him to recover the possession of the chattel. *Page* v. *Fowler*, 28 Cal. 607; *Same* v. *Same*, 37 Cal. 105; *Pennybecker* v. *McDougal*, 46 Cal. 661; *Harlan* v. *Harlan*, 15 Pa. St. 513; *Stockwell* v. *Phelps*, 34 N. Y. 363; *Nichols* v. *Dewey*, 4 Allen, 386; *Atherton* v. *Fowler*, 96 U. S. 515; Wells, Rep. §§ 79–83.

In this case the evidence shows that the land was held by the plaintiff for hay and pasture. The tract in question was not specially inclosed or occupied, but it and much more land in the vicinity, and of the same character, to which the plaintiff claimed to derive title from the state as swamp, was inclosed against stock by Lake Warner, exterior fences, some of which belonged to adjoining lands, and by herding or patroling a small portion of the exterior line. In the spring of 1885 the defendant went on the land openly, with his family, with the knowledge of the plaintiff, and against his protest, for the purpose of acquiring it under the preemption law of the United States, and has resided thereon ever since. He knew that the plaintiff claimed the land under the state as swamp, and his possession was adverse to such claim, and taken and held on the

theory that the land was not swamp, and was fit for cultivation.   The
defendant erected a cabin and stable on the land, and in the summer of
1886 cut and stacked the hay in question on the premises, for the use
of his stock.   During this time the plaintiff was not in the actual posses-
sion of any portion of the land, but he continued to claim it as his prop-
erty, and told the defendant he would appeal to the law to protect his
right.   On this state of facts the defendant is not a mere trespasser or
intruder.   His possession is open and notorious, and has the usual in-
dications of permanence.   It is held apparently in good faith, with a
claim of right and a denial of the plaintiff's right.   True, he does not
hold under color of title, which is nothing less than a deed or instrument,
that is *prima facie* a good title, although in fact it is worthless.   *Stark* v.
*Starr*, 1 Sawy. 20.   But a person in possession of public land for the
purpose of acquiring title to it under the pre-emption act, cannot, con-
sistently with such claim, hold under color of title.   The title, as he
claims, is in the United States, and he holds possession under the act
for the purpose and with the intention of acquiring such title thereunder,
subject to the determination, by the land department, of the question,
whether the land is swamp or not.   And this, I think, in such a case,
ought to be considered the equivalent of holding under color of title in
ordinary ones.   In *Page* v. *Fowler*, 28 Cal. 605, it was held, in a similar
case, that the possession of the defendant, if adverse, need not be held
under color of title.   Of course, if it appeared that this land had been
designated by the secretary of the interior as swamp, within the grant
to the state of 1860, it would not be sufficient to defeat this action for
the defendant to allege that he was in the adverse possession of the same,
in good faith, with intent to acquire the title thereto under the pre-emp-
tion act.   Such a plea would be false on its face.   The land having been
identified by the secretary as inuring to the state under the swamp-land
grant, the title would have passed out of the United States; and the de-
fendant could acquire no right thereto under the pre-emption or any other
act of the United States.   In such case, however adverse the defendant's
possession, to defeat this action he must also allege and prove that he was
holding in good faith under color of title.

Having reached the conclusion that the plaintiff cannot maintain this
action, it is unnecessary to pass on the question whether this land is
swamp or not.   And I do not regret it; for, in my judgment, no one is
qualified to decide the question in a case like this, where apparently there
is room, in the present condition of the land, for difference of opinion,
without having a view of the premises and the surroundings.   Much of
the testimony is given by interested parties, and is very contradictory.
The difficulty is still further enhanced by the fact that the inquiry is as
to the condition or character of the land on March 12, 1860, rather than
the present time.   A shallow lake or marsh, which is caused principally
by the general wash and drainage of the surrounding high lands, might
now be much reduced in extent and depth through the greater portion
of the year, compared with what they were in 1860; and such is the ten-
dency of the evidence in this case.   When the country was unoccupied,

and the ground untrodden and soft and thickly covered with grass and other vegetation, the passage of the water—melted snow or rain—over the surface of the ground was thereby impeded. The result was that it sank into the soft earth, and percolated through the soil slowly to the level of the lake or marsh at an even flow, far into the summer, and thus kept the water therein at a uniform level for much of the year. But now, owing to the change in these conditions,—the destruction of the surface vegetation and the packing of the ground,—the water from the spring melt or freshet runs off into the low land, at once, and produces a great annual overflow which soon subsides. The water, being spread over a large space, is rapidly reduced by evaporation, and the result is, that for the most of the year the water or moisture stands at comparatively a much lower level than formerly.

It is a great misfortune to the country, that the secretary of the interior did not take the field notes of the surveys, as fast as they were made, and designate the lands inuring to the state as swamp at once. For more than a quarter of a century the land department has left the question to be wrestled with in a sporadic way by conflicting claimants under the swamp-land grant and the pre-emption and homestead acts, at a great sacrifice of money, time, and, probably, veracity. Let us hope that the end of the contention draws nigh, and that the department will proceed at an early day to designate the lands inuring to Oregon under this grant, and put the matter at rest. It were better the grant had never been made than that its extent and application should be the subject of continual contention between parties claiming under and against it.

There must be a finding for the defendant in accordance with this opinion, that at and before the cutting of the hay he was in the adverse possession of the premises whereon the same was cut, and that he is entitled to a return of the same, or the value thereof, at the rate of $4 per ton, with legal interest for the detention thereof from the date of the replevy by the marshal.