NEW ORLEANS, FEBRUARY, 1900.　　　893

Betz et al. vs. I. C. R. R. Co. et al.

No. 12,510.

VALENTINE BETZ ET AL. VS. THE ILLINOIS CENTRAL RAILROAD COMPANY
ET AL.

SYLLABUS.

(1) A survey of swamp and overflowed lands granted to the State by Congress, is a sufficient selection and identification of same to segregate them from the public domain, and render them liable to sale or entry as property of the State.

(2) On the 28th of October, 1864, Gorlinski was the regularly appointed, qualified and commissioned register of the State land office, under the civil government which was established under the Constitution of 1864, and which had supplanted and taken the place of the military government which the President had inaugurated in 1862.

(3) Act 267 of 1861 did not repeal Act 290 of 1855 establishing a State land office, but left same in full force in so far as the office of register of the land office was concerned.

(4) That joint resolution No. 25 of 1863 which purported to suspend the sale, or entry of all public lands until one year after the close of the war, operated no restraint upon the land officers of the civil government which had been established under the Constitution of 1864.

(5) Title to public lands dates from the issuance of the certificate, and not from that of the patent; and the party holding a patent of date later than that of a certificate or warrant, carries the burden of proving illegalities in the certificate necessary to make it prevail over the latter.

APPEAL from the Civil District Court, Parish of Orleans. Theard, J.

Samuel Jamison for Plaintiffs, Appellants.

Farrar, Leake and Lemle (J. L. Bradford, of Counsel,) for Defendant, Appellee.

Harry H. Hall for Ruddock Lumber Company, Limited, Amicus Curiae.

Richardson & Soule, Amicii Curiae.

*The opinion in this case was handed down January 24, 1898. Pending an application for rehearing the appeal was withdrawn by consent of the parties in interest. On February 15, 1900, the court directed the publication of the opinion in this the 52d Volume of the Annual Reports.

The opinion of the court was delivered by

WATKINS, J.   This is a petitiory action for the recovery of a tract of unimproved land situated between Lakes Maurepas and Pontchartrain, at a point near which the track of the defendant railroad company intersects Pass Manchac, in the vicinity of New Orleans.   This tract embraces three hundred and ninety-eight and 16-100 superficial acres, and is of the following description, viz:   All of fractional section fifteen (15), and north half of fractional section twenty-two (22) in township nine (9) south, of range eight (8) east in southeastern land district, east of the Mississippi river.

The plaintiffs found their demands upon an alleged sale made to Nicholas Betz, Nicholas Amann and Henry Von Hoven, by Joseph Gorlinski, Register of the State Land Office on the 28th of October, 1864—suit having been brought by the heirs of Betz and Amann and Henry Von Hoven.

The defendant railroad company alleges itself to be the owner of said lands by virtue of a title from W. H. Howcott, who had previously acqúired a title from the State of Louisiana, evidenced by two patents regularly issued—averring the aforesaid purchase to have been regularly made, and that it was in the actual, *bona fide* possession of the property, exercising dominion over it, and paying taxes thereon.

Its averment is, that, on the 4th of June, 1890, the State of Louisiana issued and granted to W. H. Howcott patent No. 2780 for fractional section fifteen; and on the same date issued and granted to the same person, patent No. 2781 for the north half of the northwest quarter, and the southwest quarter of the northeast quarter, of section twenty-two, all in township nine, south range eight east, in the southeastern land district, east of the Mississippi river in the State of Louisiana, and in the Parish of St. John the Baptist—said lands having been acquired by the State from the United States, as swamp lands under the Act of Congress of March 2nd, 1849; the same having been selected by the United States Surveyor General for Louisiana on the 20th of January, 1873, as inuring to the State under said grant, and approved and patented in favor of the State on the 4th of June, 1884, by the Secretary of the Interior of the United States.

It further avers that Howcott conveyed title to J. T. Burke, and that Burke in turn, conveyed title to the railroad company.

The defendant railroad company further answering avers, that if the plaintiffs have any shadow of right or claim to the said land, or any portion thereof, they derived same from and under a fraudulent sale or location upon the same, of a pretended swamp land warrant, made and allowed by a pretended officer of the State of Louisiana, unknown to the laws thereof; and that the price pretended to have been paid for said land never reached the treasury of the State, same having been paid, if at all, to neither the Treasurer of the State, nor any officer of the State who was authorized to receive the same.

It further avers, that at the time of the alleged sale or location, the said lands had never been lawfully conveyed, nor had same ever been listed or selected as swamp lands inuring to the State under the swamp land grant of March 2nd, 1849; nor had same been approved, or patented to the State under said swamp land law, or any other law.

It charges, that in consequence of said illegalities and nullities of said pretended title of the plaintiffs, same has been disregarded and ignored by all lawful authorities of the State of Louisiana; and that same was sold to Howcott as alleged.

The foregoing resume of the pleadings discloses, that both the plaintiffs and the railroad company claim to have derived title to the land in dispute, from the State of Louisiana—the only differences between the two titles being the dates and origin thereof.

On the trial, the full and complete history of the plaintiff's title was developed; and the swamp land patents of the State to Howcott, and the deeds of the railroad company, were introduced in evidence, and they fully conform to the averments of the answer.

The judge a quo rendered judgment in favor of the defendants, without assigning any reasons in writing; and from that decree the plaintiffs prosecute this appeal.

Both parties claiming to have derived title from the State, as a common author, the question for decision is, which has the better, or paramount right of ownership in the property.

The railroad company in possession under titles derived from the patentee of recent date, attacks the plaintiffs' title of prior date, on the grounds first, that the sale to the plaintiffs, or their location upon the land in question, was illegal and fraudulent, because same was made in virtue of a pretended swamp land warrant, and made and allowed by a pretended officer of the State of Louisiana, unknown to

the law; *second,* that the price pretended to have been paid for said land by the plaintiffs, never reached the treasury of the State, same having been paid, if at all, to neither the Treasurer of the State, nor to any officer of the State who was authorized to receive the same; *third,* that at the time of the alleged sale, or location, the said lands had never been lawfully surveyed, nor had they ever been listed or selected as swamp lands inuring to the State under the swamp land grant of the United States; nor had they been approved or patented to the State in accordance with the terms and conditions of said grant.

In our opinion, it will save much labor and research to first analyze the statement made by learned counsel for the defendants, as it appears in their brief, before making an examination of the evidence *pro et con,* as it contains some admissions which are quite pertinent to the issue, and may dispense, in great part, with an examination of it; consequently we will take up that statement first, and have made extracts therefrom and reproduce them as follows, viz:

## "STATEMENT OF FACTS.

"This is a petitory action to recover 317 72-100 acres of land in the Parish of St. John the Baptist, designated in the petition as lots 1 and 2, the southwest quarter of northeast quarter and north half of northwest quarter of section 22, and of fractional section 15, in township 9, south range 8, east, in the southeastern land district, east of the Mississippi river.

"The lands were granted to the State of Louisiana by Act of Congress of March 2, 1849, R. Statutes 352, entitled 'An act to aid the State of Louisiana in draining the swamp lands therein.' This act is now known to have passed title to the State to some 10,000,000 acres of land, of the character described as swamp and overflow lands, and in order to dispose of this property and other property in public lands acquired under prior legislation of Congress, the State, by Act No. 298, of the 15th of March, 1855 (page 350 of the acts of that year), created and established at the seat of government a land office, to be administered by the Register of said office, to be appointed by the Governor by and with the consent of the Senate. By Act 113 of 16th of March, 1859 (page 91, acts of that year), the Register of the Land Office was authorized to sell 1,000,000 acres of the swamp land donated

under the legislation aforesaid. Under this law the plaintiffs pretend to derive title to the land involved.

"The State of Louisiana seceded from the Union of the United States by ordinance of her Secession Convention, passed on the 26th of January, 1861, and by ordinance of that convention of 12th February, 1861 (page 54, Journal of the Convention), assumed ownership and control of all unappropriated lands within her limits, including the public lands of the United States, as well as lands she might rightfully claim under the Swamp Land Donation aforesaid, and other donations made by Congress. The second session of the State Legislature began at Baton Rouge 21st January, 1861 (which Legislature had been elected before secession, and had held an extra session in December, 1860), and by Resolution No. 44 of the 28th February, 1861 (page 33 of the acts of that year), appointed a committee to examine and report upon the subject of the prairie lands of the State and United States within the limits of the State. In pursuance of a report of this committee, and of the ordinance of the Secession Convention referred to, the Legislature on the 21st March, 1861 (page 205, of the acts of that year), passed the important Act No. 267, establishing a General Land Office at the seat of government, and remodeling entirely the land system of the State. This law necessarily repealed the Act of 1855 establishing the State Land Office, and that office was not recognized and re-established until the Legislature passed Act No. 38 of the 16th March, 1870 (page 89 of acts of that year).

"After the secession of the State, and during the Civil War which followed, Louisiana maintained her autonomy as a State and sovereign, her legislative, executive and judicial departments being administered and continued under the Constitution of 1852. Accordingly there was an extra session of the Legislature at Opelousas, begining in December, 1862, and extending to January 3, 1863. The next was an extra session of the Legislature at Shreveport, May 4, 1863, and continuing to June 20, 1863; the next was a session of the Legislature, beginning at Shreveport January 18, 1864, and continuing to February 11, 1864.

"By joint resolution No. 25 of June 16, 1863 (page 19, acts of that year), the Legislature then sitting at Shreveport, declared that *all lands within the State then subject to entry or location should be withdrawn from market and should not be disposed of until twelve*

*months after the end of the then existing war.* This law was not subsequently repealed, and suspended all power and authority in the State officers, provided for by the act of 21st March, 1861, to sell or otherwise dispose of the public lands.

"Under this condition of affairs, the Northern armies having gotten a permanent footing in New Orleans and its immediate vicinity in April, 1862, the President of the United States, by military order of June 3, 1862, appointed and commissioned Brigadier General George F. Shepley as Military Governor of Louisiana, ·investing him 'with all and singular the powers and duties and functions appertaining to the, office of Military Governor (including the power to establish all necessary offices and tribunals and suspend the writ of *habeas corpus*), during the pleasure of the president, or until the loyal inhabitants of the State shall organize a civil government.' etc.    See case of Mechanics Bank vs. Union Bank, 22 Wallace, 306.    February 11, 1864, Major General N. P. Banks, commanding the Department of the Gulf, issued an order for the election of State officers, and on the 22nd of February, 1864, Brigadier General Shepley, Military ˙Governor, made the returns of the election held in pursuance of General Banks' order, declaring what officers had been elected, Michael Hahn, as Governor, J. G. Belden, as Treasurer, and J. M. Wells, as Lieutenant Governor.    These people were inaugurated in their respective offices March 4, 1864, in the Lafayette Square, in New Orleans, and on the 29th of July in that year, J. M. Wells, as Acting Governor, appointed Joseph Gorlinski, as *provisional* Register of the State Land Office, accompanying the commission with a letter of instructions of same date, in which it is said, '*as the records of said office have been carried away by the Rebel authorities, and as no sales of public lands belonging to the State can be made until they are supplied,* your chief and immediate duty will be addressed to that object,' etc.

"April 2, 1864, a convention, purporting to have been a convention of the people of Louisiana, assembled in New Orleans, and made a Constitution, known as the Constitution of 1864, which was submitted to the people of a portion of the State in September, 1864, and seems to have been ratified by a vote of 6836, against 1566 (Poor's Federal and State Constitutions, part 1, p. 740).    The election, of course, was confined to the City of New Orleans and its vicinity, then under the guns of the Federal fleet.    This Constitution declared, in Article 148, that it superseded the Constitution of 1852, and by

Article 149 it was declared that all laws in force at the time of its adoption, and not consistent with it, should continue as if the same had not been adopted.

"Under the Constitution of 1864 a Legislature was held in New Orleans, beginning October 4 and extending to April 4, 1865, and this Legislature by Act No. 17 of 31st December, 1864 (page 28, acts of that year), appropriated $2540 to pay Joseph Gorlinski for maps, etc., alleged by him to have been furnished for organizing the office to which he had been appointed. This act seems to be the only one in any way recognizing Gorlinski as a State officer, and no act was ever passed providing for his compensation, or otherwise, directly or indirectly recognizing, sanctioning, or ratifying his acts or authority as a State officer.

"Beginning with October 14, 1864, and extending to March 30, 1865, inclusive, Gorlinski, as Provisional Register of the Land Office seems to have made 122 *quasi* sales or locations of swamp lands, and to have *made or* issued warrants for the location of lands in said 122 cases.

"October 28, 1864, it seems there was a warrant No. 28, prepared in his office, which purports to have been issued under Act No. 113 of March 16, 1859, in favor of Nicholas Betz, Nicholas Amann and Henry Von Hoven, for the quantity of 398 and 16-100 acres of land, for the price of $1.25 per acre, or a total of $498.70, and by the stub to said warrant now found in the State Land Office, said warrant appears to have been intended for location upon the lands sued for in this case.

"It appears that this *original* warrant is still on file in the State Land Office, and has never been delivered to the alleged purchasers or to any one else. No certificate or receipt seems to have issued on this alleged sale or location, and the rights of the plaintiffs, if any they have, seem to be deduced from the original warrant as now found in the Land office.

"Early in 1865 Michael Hahn resigned as Governor of Louisiana and J. M. Wells succeeded him, and on July 13, 1865, appointed Adolph Dupre Register of the Land Office (see Act No. 17, of December 21, 1865), who proceeded to obtain the records of the old State Land Office, abolished by the act of 1861, and which had been in possession of the State authorities at Opelousas and Shreveport during the Civil War, whence they had been removed with the other archives of the State government from Baton Rouge in 1861 or early in 1862. This officer made a report in November, 1865, to J. M. Wells, Gov-

ernor, on the first page of which he sets forth how he obtained the records, how he was proceeding to reopen and reorganize the, office; and on page 15 furnishes a statement giving a history of each one of the 122 sales of land made by Gorlinski, as Provisional Register, aforesaid. On page 16 of this report, with reference to the sale, entry or location involved in this suit, he states: *'Conflicts with private claim. No approved map on file with such subdivision, nor is the land approved to the State.'* In reference to these 122 sales, entitled 'Sales by Gorlinski,' on page 4 of this report, Mr. Dupre says: *'Awaiting the action of the Legislature with regard to the sale of lands, and not knowing whether they will be confirmed or rejected, I merely noted them in pencil upon my records until further instructed.'*

"In consequence of this dilemma the State Register found himself in the Legislature by Act 28 of 21st February, 1866 (page 50, acts of 1866), which declared *'that the officers of the State Land Office are directed to suspend the sale of such public lands as have already been entered by any party since the outbreak of the late Civil War,* and in all cases where a second entry has been made before the promulgation of this act, to suspend the issuance of the patent in the name of the State, for said second entry.'

"The force and affect of this act are to be found in the long preamble, which states that during a part of the war there had been two rival State governments in Louisiana, each disposing of the public domain of the State, in some instances selling the land the other had sold, thereby creating a fruitful source of litigation, etc. The further sale of these lands having been suspended by this act, the Legislature by Act 104 of 31st May, 1871 (page 243, of acts of that year), in Section 12, declared 'That all sales and locations of public lands made by this State from the 1st of January, 1861, *to the 14th of October, 1864, which are shown by the records of the Register's Office,* be and the same are hereby confirmed, and patents shall, on demand, issue in the name of the purchaser, and be delivered to the party surrendering the proof of entry or location, or on making to the satisfaction of the Register proof of loss.' This act seems to limit its benefits to sales and locations made previous to the earliest one made by Gorlinski.

"It seems that township 9, south range 8 east, in which the lands involved are situated, was ineffectually and illegally surveyed during the year 1861 by Theodore Gillespie, former United States Deputy Surveyor, but then acting under authority of William J. McCullogh,

who had been appointed by the Governor of Louisiana, Thomas O. Moore, in 1861, as Commissioner of Public Lands, the office created under Act of 1861, previously referred to, abolishing the State Land Office. The office of Commissioner of Public Lands for the State of Louisiana was a substitute for the office of Register of the State Land Office, created by the Act of 1855. This McCullogh, as Commissioner for Public Lands of Louisiana, on August 30, 1861, approved Gillespie's survey, and made and approved at the same time a list of lands in said township subject to tidal overflow, as represented from the approved field notes of said Gillespie, deputy surveyor. This list embraced the lands sued for.

"After the Federal authorities and the Federal land system, including the United States Surveyor General's Office for the State of Louisiana, had been restored and re-established in Louisiana, which took place in the year 1869, or thereabouts, the United States made a regular and lawful survey of this township by William N. Robinson, under contract of August 8, 1872, which survey was approved by the United States Surveyor General, Foster, January 20, 1873; on the same day he certified a list of swamp land selections under the Act of March 2, 1849, certifying that the lands therein embraced appeared to be swamp and overflow lands by the field notes of said Robinson, and accrued to the State of Louisiana under Act of March 2, 1849. This list embraces all the lands now sued for, and was approved by the Secretary of the Interior June 4, 1884, as per list No. 38, and by the terms of the Act of 1849 the lands on such approval became 'subject to the disposal of the Legislature.'

"Accordingly, on June 4, 1890, the Register of the State Land Office and the State Treasurer, as receiver of said office, made sale to W. H. Howcott of all the lands in this suit and claimed by plaintiff, and in pursuance of said sale, granted her patents of the same date, No. 2780 and 2781, to the purchaser, and the defendant, the Illinois· Central Railroad Company, deduces title under said patents by regular chain of conveyance, duly executed, and recorded in the Parish of St. John the Baptist, where said lands are situated. This sale was made to Howcott under authority conferred by the first part of Section 10, Act No. 75 of April 7, 1880 (page 85, acts of that year), the price paid being 75 cents per acre. This sale and the patents seem to proceed upon the theory that the pretended sale or location made by Gorlinski on the 28th of October, 1864, was void, not having been confirmed by

the Act 104 of 31st May, 1871. Under such sale and patent to How-cott the railroad company had been in possession for some years, pay-ing taxes, using the timber, and otherwise performing publicly and notoriously unequivocal acts of ownership in good faith as owner. The District Court gave judgment for the defendants (Rec. 43) and plaintiffs have appealed."

Making an analysis of the foregoing excerpts, we find the following facts admitted, viz:

1st.—That the lands in controversy originally formed part of a large domain of swamp and overflowed lands which the United States Government donated to the State of Louisiana in 1849; and that in order to facilitate the disposition of same, the General Assembly passed an act in 1855, establishing a Land Department to be adminis-tered by a Register of the State Land Office, and subsequently another act authorizing him to sell one million acres of swamp lands.

2nd.—That, subsequently to the date of the secession of the State of Louisiana from the United States Government, and after the Federal army had occupied the City of New Orleans and the territory contiguous thereto in 1862, the President of the United States ap-pointed General Shipley Military Governor of Louisiana, and vested in him, by virtue of said appointment, full and plenary power as such during the pleasure of the president, "*or until the loyal inhabitants of the State shall organize a civil government.*"

3rd.—That in pursuance of that reservation in the order of the president creating a military State government in Louisiana, General Banks, who was in command of the Department of the Gulf which embraced the State of Louisiana, issued an order for an election of State officers, bearing date February 11th, 1864; and that he made and caused to be promulgated a compilation of the election returns on the twenty-second of the same month, which showed the election of Michael Hahn as Governor; J. G. Belden, as Treasurer; and J. M. Wells, as Lieutenant Governor.

4th.—That to each of the aforesaid officers was regularly adminis-tered the oath of office, and they were regularly inaugurated on the fourth of March, 1864, and installed in their respective offices.

5th.—That on the 2nd of April, 1864, a Constitutional Convention was held at the capitol in New Orleans, and that it subsequently adopted a new Constitution for the State of Louisiana, and caused same to be duly promulgated in September, 1864; an article of which

declared that it superceded the Constitution of 1852, and all laws not consistent therewith.

6th.—That on the 29th of July, 1864, J. M. Wells, Acting Governor of Louisiana, appointed Joseph Gorlinski *provisionally* as Register of the State Land Office; and accompanying his commission there was a letter which stated, that "as the records of said office have been carried away by the Rebel authorities, and as no sales of public lands belonging to the State can be made until they are supplied, your chief and immediate duty will be addressed to that object," etc.

7th.—That under the Constitution of 1864 a General Assembly was duly chosen, and held a session at the seat of government at New Orleans, commencing on the 4th of October, 1864, and continuing until 4th of April, 1865; and that that legislative assembly, on the 31st of December, 1864, made an appropriation of the sum of $2540, with which to reimburse to Joseph Gorlinski, Register, the expense he had incurred in organizing and establishing the land office in pursuance of his appointment aforesaid.

8th.—That, beginning with the 14th of October, 1864, and concluding about the 30th of March, 1865, inclusive, Gorlinski, Register, made one hundred and twenty-two (122) *quasi* sales, or locations of swamp lands, or caused to be issued, or made land warrants for the location of lands in one hundred and twenty-two different cases, and that on the 28th of October, 1864, he caused to issue swamp-land warrant No. 28, "which purports to have been issued under Act 113 of " March 16th, 1859, in favor of Nicholas Betz, Nicholas Amann, and " Henry Von Hoven, for the quantity of three hundred and ninety " eight and 16-100 acres of land, for the price of one dollar and a " quarter ($1.25) per acre, or a total of $497.70; and that it appears " by the stub to said warrant now found in the State Land Office, " (that) said warrant appears to have been intended for location upon " the lands sued for in this case."

9th.—That early in 1865 Michael Hahn resigned the office of Governor and J. M. Wells succeeded him, and on the 13th of July, 1865, appointed Adolph Dupre, Register of the Land Office, "who proceeded " to obtain the records of the old State Land Office abolished by the " Act of 1861, and which had been in possession of the State authori- " ties at Opelousas and Shreveport, during the Civil War, whence " they had been removed with other archives of the State government " from Baton Rouge in 1861, or early in 1862," etc.

10th.—That in November, 1865, Dupre, Register, made a report to Governor Wells, in which he fully described the manner in which he obtained the records, and was proceeding to open and re-organize the land office; and that, in his capacity of *Register of the Land Office* he furnished a complete statement and "history of each one of the one " hundred and twenty-two (122) sales of land *made by Gorlinski, as* " *Provisional Register aforesaid.*"

The foregoing admissions are to be considered in connection with the following additional facts which are shown by the record, to-wit:

1st. (*a*) A certified extract from the records of the State Land Office, made by John S. Lanier, Register, on the 9th of June, 1896, which contains the following recitals, viz: (*a*) "That, in pursuance of Act " 113 of * * * 16th of March, 1859, Joseph Gorlinski, Register of " the Land Office, and J. G. Belden, Treasurer of the State, and " receiver of the Land Office, did cause to be sold at the City of New " Orleans on the 28th day of October, 1864, a warrant No. 28 for three " hundred and ninety-eight and 16-100 acres of swamp and overflowed " lands, donated as swamp and overflowed land by Act of Congress of " the 2nd of March, 1849, and the 25th of September, 1850, and to be " disposed of under the provisions of said act * * * when, " Nicholas Betz, Nicholas Amann and Henry Von Hoven of New " Orleans became the purchasers thereof, for $497.70 which were paid " to the receiver aforesaid on the 28th of October, 1864. 'And further, " that, now, therefore, we do hereby sell and warrant to the said " Nicholas Betz, Nicholas Amann, and Henry Von Hoven, and hereby " authorize them and their heirs and assigns to locate said warrant " upon any of the swamp lands within the State, and subject to loca- " tion and sale under the act aforesaid'."

(*b*) That said swamp land sale of warrant No. 28, is signed by the official signatures of Jos. Gorlinski, Register of the Land Office, and J. G. Belden, Treasurer of the State, and receiver of the Land Office, and attested with their respective seals of office, on the 28th of October, 1864.

(*c*) That upon a stub opposite said act of sale, and attached thereto, are found the following indorsements, viz: (1) "Warrant No. " 28 issued to Nicholas Betz, Nicholas Amann, and Henry Von Hoven " of New Orleans. Quantity 398 16-100 acres. Price one dollar and " twenty-four cents per acre. Amount received $497.70. Date 28th " of October, 1864; (2) Location and description of tract. All of

" fractional section fifteen (15) and north half of fractional section
" No. twenty-two (22) of township No. nine (9) south, of range No.
" eight (8) east, district southeastern, east of Mississippi river."

2nd.—A further extract from the records of the State Land Office,
made and certified to as the foregoing is, same being from the sales
book of the Land Office, and which furnish an exact repetition of the
recitals of the foregoing act of sale, and location.

3rd.—A copy of the field notes of a survey of township nine (9)
south, and range eight (8) east of southeastern land district of Louis-
iana, east of the Mississippi river, made by Theodore Gillespie, Dep-
uty Surveyor General in 1858, and duly certified to by M. J. McCul-
loh, Commissioner of Public Lands on the 30th of August, 1861—as
appears from the certificate of Charles A. Dickinson, Surveyor Gen-
eral of Louisiana on the 5th of December, 1896—the lands in contro-
versy being therein embraced.

4th.—A similar copy similarly certified by same officer from the
Land Office book known and marked "Swamp Land Selection South-
eastern Land District of Louisiana"—showing description of lands in
suit.

5th.—The testimony of John S. Lanier, the present Register of the
State Land Office which shows that he is familiar with "what are
called the Gorlinski sales," and had examined the records of his office
in connection with them, just before testifying; and that amongst
other things it contains the statement, that amongst the books which
Gorlinski used, and which are now on file in his office, is one "known
as a book of certificates or sales book, containing 122 entries, or sales
purporting to have been made by Gorlinski."

6th.—The additional statement of the Register to the effect, that at
the close of the war, the records of the Land Office were removed to
the City of New Orleans, and subsequently to Baton Rouge, where
they have since remained.

7th.—The further statement, that from looking at the act above
referred to in his opinion it "shows a sale from the State to Nicholas
" Betz, Nicholas Amann, and Henry Von Hoven of three hundred and
" ninety-six and 16-100 acres of land, and that the Auditor gave pay—
" in certificate 329 on the treasurer and receiver," etc.; and that
judging by the Treasurer's receipt, he gave it as his opinion that the
money went into the State Treasury.

906 SUPREME COURT OF LOUISIANA.

Betz et al. vs. I. C. R. R. Co. et al.

8th.—The following quotation from the record, viz: "Q. As "Register of the State Land Office, with this evidence of the sale "before you of this land by the State of Louisiana to Betz, Amann "and Von Hoven, would you consider it a good sale, if it were not "that you consider Gorlinski had no right to the office of Register?

"A. I would say so. It seems, that the money was credited and "properly receipted for in the Treasurer's office."

9th.—The further question from the record, viz: "Q. Was there "ever to your knowledge, or as shown by your records any receipt, or "certificate, or warrant, or patent ever *delivered and issued out of* "*your office or the office* of Gorlinski as Provisional Register, on the "entry or location made by Betz, Amann, and Von Hoven, to which "sale or location you have testified?

"A. Well, there evidently was a warrant, as the warrant is in the "book yet; *and I presume from the stub-book, that there was a certi-* "*ficate issued to the Auditor as to the location of that* warrant, as the "stub would indicate, which is on file in the State Land Office.

"As to a patent, I have no knowledge of any patent ever having "issued to these parties," etc.

10th.—The certificate of the Auditor under date January 6th, 1897, that it appears from ledger A of sales of swamp lands, that in October, 1864, Betz, Amann and Von Hoven purchased the lands in suit— furnishing an exhibit from folio 96 of said ledger now on file in his office, showing the sale.

11th.—The testimony of the Auditor to the effect, that the Treas- urer's receipt "shows conclusively that the sum of $497.70 was paid into the State Treasury for 398 16-100 acres of land by Nicholas Betz, Nicholas Amann and Henry Von Hoven," etc.

12th.—The testimony of the chief clerk of the State Treasurer to the effect, that certificate No. 229 was issued showing the receipt of payment of the sum of $497.70 for the account of the swamp land fund on the 28th of October, 1864; and further to the effect that the book from which said information was derived "is an official record and now one of the archives of the Treasurer's office;" and that this book was found in the basement of the building about a month or "more ago," and is "now in the Treasurer's office."

13th.—The testimony of Henry Von Hoven, one of the plaintiffs, to the effect that he and his associates purchased the land in controversy in 1864, and at once they made preparations to cut wood therefrom for

the Jackson railroad company; and that he was so occupied for five or six months, continuously. That he sold the best of the wood to the wood-yards; and that he also made cross-ties for the Canal street railroad company from timber cut from said land. That Nicolas Betz chopped wood about three months later; and that they then tried to sell the land.

The witness then speaks of the papers they obtained from the land office, and recites the circumstances under which they were lost or destroyed. He says that all three of the parties named in the act of sale, were present at the land office in New Orleans when the land was purchased and the money was paid therefor.

*Per contra* the record shows further that on the 20th of January, 1873, E. W. Foster, U. S. Surveyor General for the State of Louisiana, made and approved a list of swamp and overflowed lands from field notes of Wm. H. Robinson, deputy surveyor, accruing to the State of Louisiana, under the swamp land act of 1849—including fractional sections fifteen and twenty-two—; but the *proviso* is appended to that officer's certificate to the effect that it excepts "such portions " thereof as are rightly claimed or owned by individuals."

That on June 2nd, 1884, the foregoing list of lands was examined by the chief of the swamp land division and the examiner thereof at Washington, D. C., and to it they appended their certificate to the effect that same had been by them duly examined ,"and that it ap- " peared from the tract books of their office to be free from conflict or " otherwise".

That said list and certificates were duly examined by the commissioner of the general land office and submitted to the Secretary of the Interior on the 3rd of June, 1884, and "recommended for approval".

That on the 4th of June, 1884, the Secretary of the Interior examined said list and certificates, and thereon made the following indorsement, viz: "The foregoing list of swamp land selections  *  *  *  is " hereby approved *subject to any valid adverse rights that may sub- " sist to any tracts therein described."*

That the foregoing list and certificates, with the endorsement of the Secretary of the Interior, formed part of the archives of the United States Land Office at New Orleans, Louisiana, at the time this suit was filed, and at the date of the issuance of patents to the land in controversy under which the defendant railroad company claims ownership.

That the certificate of Charles H. Dickinson, Surveyor General of Louisiana, on the 5th of December, 1896, shows that the map of the area in question—the swamp and overflowed lands which are covered by the grant of 1849—which was made by Wm. J. McCulloh, Commissioner of Public Lands, on the 30th of August, 1861, was predicated upon field notes which had been previously prepared by Theodore Gillespie, Surveyor General, *under a contract of date March 20th, 1858.*

That the same certificate of Dickinson shows, that only a re-survey was made in 1861; whereas "the swamp lands accruing to the State of " Louisiana under act of Congress approved on the 2nd of March, 1849, " *had been selected (previously) under the provisions of said Act."*

That it finally appears from the certificate of E. W. Foster, Surveyor General, of date *January 20th, 1873, that the field notes of Wm. H. Robinson, surveyor, made in 1872, were predicated upon a re-survey,* and not upon a new and original survey of contemporaneous date.

Applying the foregoing admissions and evidence to the defendant's contentions, we find (1) that the transactions of the plaintiffs with the Register of the State Land Office with regard to the purchase of the land in question, were neither fraudulent nor pretended, but were, on the contrary, regular and legal, in every particular.

(2) That the plaintiffs and their authors paid the price of one dollar and a quarter per acre to the Register of the Land Office for the three hundred and ninety-eight and 16-100 (398 16-100) acres of swamp land which are called for, and covered by the deed furnished by the register and receiver; and that said money—four hundred and ninety-seven and 70-100 dollars—duly evidenced by a warrant of the Auditor, was paid regularly into the treasury of the State therefor.

Finding these propositions established, there remain but two questions open for discussion (1) whether the sale and location of the said land were made by a *pretended* officer of the State unknown to the laws thereof; (2) whether at the time of the alleged sale, or location, the said lands had been listed or selected as swamp and overflowed lands; or had they been approved or patented to the State in accordance with the granting act of Congress.

I.

Taking the second proposition first, we find the contention of the counsel of the defendant railroad company to be, that it derived title

through two patents which were issued by the State of Louisiana on the 4th of June, 1890, to W. H. Howcott—said lands having been acquired by the State from the United States as swamp and overflowed lands under the act of Congress of March 2nd, 1849. That same were selected by the United States Surveyor General for the State of Louisiana under said swamp land grant; and that same were approved and patented in favor of the State of Louisiana on the 4th of June, 1884, by the United States Secretary of the Interior.

And their further contention is, that at the time of said alleged sale, or location by the plaintiffs, or their ancestors, of the lands in controversy, same had never been either lawfully surveyed, listed, located or selected as swamp lands inuring to the State of Louisiana under the granting act; nor had same been approved or patented to the State, at that time.

Therefore, the counsel of the defendant railroad company charges, that on account of these nullities and illegalities, in part, the alleged sale or location of said lands to the plaintiffs and their ancestors have been disregarded and ignored by all the lawful authorities of the State; and that in consequence thereof, in part, the State of Louisiana sold the aforesaid lands to Howcott and issued to him patents therefor, under which it holds title and present possession.

The records which have been referred to, disclose the fact, that Deputy Surveyor Gillespie made a survey of township nine, of range eight, embraced in the area of the swamp and overflowed lands, in 1858, as is shown by certificates of McCulloh, in 1861, and Dickinson, 1896—the latter showing that McCulloh's map was based upon field notes of Gillespie's survey made in 1858; and that a *re-survey only* was made in 1861, on which the field notes of Surveyor General Robinson was predicated in 1872.

This fact is further confirmed by the parol testimony of Charles H. Dickinson as witness, whose statement is, that a survey was made "by Theodore Gillespie under contract with the United States in 1858, and approved by William J. McCulloh * * * on August 30th, 1861." The second survey was made by W. H. Robinson, in 1872 and 1873, and approved by A. W. Foster, Surveyor General, on January 20th, 1873.

Consequently, no selections of swamp and overflowed lands were based upon the map of McCulloh, but all the selections were founded primarily, upon the field notes of the survey which Gillespie made in

1858; and that survey preceded by two years, the secession of the State of Louisiana from the Federal Union.

The testimony shows that there is in the land office at this time— and was presumably in 1890 when patents were issued to Howcott—a book known as "book of Gorlinski's sales", in which are entered all the *data* which appertain to the one hundred and twenty-two sales or entries of swamp or overflowed lands which Gorlinski, Register, made in 1864 and 1865—those to which the evidence was directed, and of which that of the plaintiffs is one.

The certificate of Surveyor General Foster, dated in 1873, approving a list of swamp and overflowed lands, contains the statement, that it excepts therefrom "such portions thereof as are rightfully claimed as owned by individuals."

It was subject to that exception, that said list was approved, by the examiner, and the chief of the swamp land division of the General Land Office.

It was subject to that exception, that same was by the Commissioner of the General Land Office approved and recommended to the Secretary of the Interior for approval.

And finally, said list, containing the foregoing exception, was approved by the Secretary of the Interior; and he made the official declaration in his endorsement thereon, that it was "subject to any valid adverse rights that may subsist to any tracts therein described."

There is nothing in the record to authorize the statement, that the aforesaid officials recognized the Gorlinski sales or entries as constituting such a "valid adverse right" as their certificates imply; but they certainly show, that it was not their intention to exclude them from consideration in the determination of the area that was thus listed, selected and approved by the Interior Department. It is equally true, that those certificates do not attempt to show that the swamp and overflowed lands were for the first time selected and set apart from the public domain of the United States government in 1873.

Notwithstanding that it does not appear, that the Gillespie survey was approved by the Surveyor General prior to 1861, yet it was deposited among the archives of the Land Office; and it was subsequently approved by McCulloh, and shown to be correct by the survey of Robinson in 1873, *who used his field notes.*

With regard to the claim which is made to the effect, that the sales made by Gorlinski were at least rendered questionable by the report

## NEW ORLEANS, FEBRUARY, 1900. 911

Betz et al. vs. I. C. R. R. Co. et al.

which was made to the Governor in November, 1865, by Ad. Dupre, Register—successor in office to Gorlinski—it is only necessary to say, that this report only purports to show that the lands which are embraced in sections fifteen and twenty-two were *not approved* to the State as swamp lands, and that there was *no approved map on file;* and these are the same objections that have been met and successfully answered by the plaintiffs.

In order that swamp land may be effectually severed and segregated from the governmental domain, and a title passed to the State, conferring authority to make sales thereof, the selection and approval in behalf of the State "must be preceded by a *survey* thereof, made under the authority of the government". But in Cole vs. Thompson, 35th Ann., 1026, this court said: "There is a legal presumption, that all swamp lands were *surveyed* before their selection was approved by the general government. The law required them to be surveyed before being presented for approval; and the officers charged with approving them are presumed to have done their duty."

In Wright vs. Roseberry, 121 U. S., 488, it was held that the grant of swamp lands by the general government to the several States, "is one *in presenti* passing title to the lands of the character therein described, from its date, and requiring *only identification thereof* to render such title complete."

See also, San Francisco Saving Union vs. Evans, 28th Federal Reporter, 708.

On this state of facts, our conclusion is, that the defendants' contention, that the land granted by the swamp land act was, for the first time, selected and surveyed by the Surveyor General on the 20th of January, 1873, is incorrect—same having been previously surveyed and selected in 1858. And our further conclusion is, that the approval of the list of surveyed swamp lands by the Secretary of the Interior in 1873, subject to any prior, valid, adverse rights thereon subsisting, did not exclude, but saved all entries and sales thereof that had been made intermediately, between the date of such original survey in 1858, and the Secretary's approval in 1873—leaving the validity thereof open to subsequent determination.

## II.

As tending to show a want of capacity, and legal authority in Gorlinski, Register, in October, 1864, counsel for the defendant railroad

company point out, that after the adoption of the secession ordinance by the State of Louisiana, on the 26th of January, 1861, and her assumption of control and ownership of all unappropriated public lands within her limits—including the swamp lands, which had been granted by Congress, in 1849—the Legislature passed Act 267, on March 21st, 1861, establishing a general land office at the seat of government, whereby the entire land system of the State was remodeled; and that the legal effect of that enactment was to repeal, by implication, the prior Acts No. 290, which was approved on the 15th of March, 1855, and Act No. 113, which was approved on the 16th of March, 1859—authorizing sales, and locations thereof.

That after secession and during the civil war which ensued, the State of Louisiana maintained her autonomy as a sovereign State, under the Constitution of 1852—all departments of the State government having been kept in operation in the meantime.

That the General Assembly of the State held a session commencing in December, 1862, at Opelousas, and continuing until January 3rd, 1863.

That it, also, held a session at Shreveport, commencing on the 4th of May, 1863, and continuing until June 20th, 1863.

And that it held another session commencing at Shreveport on January 18th, 1864, and continuing until February 11th, 1864.

They further point out, that after the adoption of the conventional ordinance of February 12th, 1861, assuming the control and ownership of all the public lands, the General Assembly adopted joint resolution No. 44, on February 28th, 1861, authorizing the appointment of a committee to examine into the *status* thereof; and that in pursuance of a report of the committee appointed, Act 267 was passed on the 21st of March, 1861, remodeling the State land office, which remained unrepealed until the passage of Act 38 of 1870, which re-established the land system of Louisiana.

That during this regime, the General Assembly adopted joint resolution No. 25 on June 16th, 1863, whereby all sales and entries of the public lands were suspended, and the lands themselves were withdrawn from market "until twelve months after the then existing war."

Based upon these representations, the contention of counsel for the railroad company is, that Act 207 of 1861, and the ordinance of the Secession Convention, abolished the State land office as it was created by Act 290 of 1855, "and substituted in lieu thereof a totally dif-

ferent and distinct set of offices, and officers for the disposition of the swamp lands," etc.; that, consequently, the appointment of Gorlinski, as register of the land office   *   *   *   was void, as the appointment of an officer to an office which did not then exist", and that his acts as such were *ultra vires* and void.

Their further contention is, that the suspension of all sales and entries of public lands by the terms of the joint resolution of 1873, and the withdrawal of all public lands from market during the existence of the war, and for one year thereafter, took from the regular State officers the power of disposing of the public lands during the period of time specified.

Without, for the present, passing upon and determining these questions, we will examine into the condition of public affairs, as they existed in the State of Louisiana immediately after the adjournment of the Legislature at Shreveport on the 11th of February, 1864.

It is not claimed by counsel for the railroad company, that there was any session of that Legislature *subsequent to that adjournment;* and it is a fact—one not without significance—that, contemporaneously with the aforesaid adjournment on the 11th of February, 1864, General Banks issued his order for the election of State officers, the result of which were compiled and officially promulgated on the 22nd of February, 1864.

A further and important fact is, that subsequently thereto, a new constitution having been adopted for the State and duly ratified at an election held in September, 1864, a session of the General Assembly which had been elected thereunder, was duly convened at the seat of government in the city of New Orleans, commencing on the fourth of October, 1864, and ending on the 4th of April, 1865.

And it is a further fact, that the aforesaid General Assembly recognized Gorlinski as register of the land office, and duly empowered as such, to reorganize the land office, and recover all the archives thereof which had been theretofore in the control of the State government as it existed prior to the adoption of the Constitution of 1864; and this is evidenced by an appropriation it made of $2540.00 for the purpose of reimbursing him the amount of his expenditures in their recovery.

It is, also, shown by the admissions of the counsel and the fact is, that the one hundred and twenty-two sales which were made during Gorlinski's incumbency, were made during the session of that Legislature—that is to say between the 14th of October, 1864, and the 30th

of March, 1865—during the term of Michael Hahn as Governor of the State, subsequent to the reorganization of the government under the Constitution of 1864.

Reference to the Acts of the Legislature of 1864, discloses that Act No. 1 of that session was signed by Michael Hahn, as Governor, on the 19th of October prior to the date of sale by Gorlinski, Register, to Nicolas Betz and his associates; and that Act No. 26, was the first one which was signed by J. Madison Wells as Governor, on the 14th of March, 1865, *vice* Michael Hahn, resigned.

Reference to the Acts of the General Assembly which convened on the 22nd of January, 1866, shows, that all of the legislative enactments of that session were signed by Wells, Governor; and the same is true of the legislative session which commenced on the 28th of January, 1867.

From the defendants' evidence it appears that an official report was made by "Ad. Dupre, Register of the State Land Office" to J. Madison Wells, Governor, in November, 1865, in which he made the statement, that in compliance with the latter's instructions, he gave in detail the sales and transactions of that office "during the (preceding) four years"—commencing with the date January 1st, 1861.

From the foregoing the conclusion to be deduced is irresistible that Dupre was appointed register of the land office by Governor Wells, and that no question has been urged, or can be urged by the defendants, of the regularity or validity of his appointment.

It is shown by Act No. 17, bearing date December 21st, 1865, that Dupre was appointed register on the 1st of July, 1865, by Wells, Governor, soon after his induction into office; and consequently his appointment and report preceded the passage of Act 38 of 1870, which reorganized the land system of the State, as defendants allege.

Our conclusion is, that quite as much can be claimed for the *authority and capacity of Gorlinski* as register, as is *admitted and shown to have existed in Dupre, register;* as they were both officers of the same State government—the latter being the immediate successor of the former—which was organized and set in motion under the Constitution of 1864.

The *military* government which was inaugurated by the President in 1862, as a war measure, was supplanted by the *civil* government which was inaugurated by General Banks in February, 1864, and con-

summated by the adoption of a new State Constitution in September of that year.

The adoption of that Constitution, the election of public officers, and the organization of all departments of the State government thereunder, was the substitution and re-establishment of such a civil government therein as was contemplated by the President in his order establishing a military government; and, as a necessary consequence, the substitution and establishment of that civil government for the military, carried with it the abolition of any prior civil government of the State; and the adoption of the Constitution of 1864, supplanted that of 1852 and repealed all laws which were in contravention thereof, or antagonistic thereto.

In reviewing a similar controversy, this court held in Cole vs. Thompson, 35th Ann., 1026; that while "it is true, that at that time (1862) the State was a member of the Confederacy then at war with the United States, that fact worked no forfeiture of title to her lands, or any other property within her limits. The State had preserved her autonomy complete, possessing a government fully organized, each department thereof in the full exercise of all its powers and functions, and whose existence was in no manner affected by the state of war then existing."

That decision meets with our entire approval and concurrence; and it is entirely consistent with the course of decision in the Supreme Court.

The extent to which the power of military governments were deemed to have extended during the period when the late war was in progress, is well defined by the Supreme Court in Texas vs. White, 7th Wallace, 733, from which we extract the following, viz:

"It is not necessary to attempt any exact distinction within which the acts of such a State government must be treated as valid or invalid. It may be said, perhaps, with sufficient accuracy, that acts necessary to peace and good order among citizens, such, for example, as acts sanctioning and protecting marriage, and the domestic relations governing the course of descents, regulating the conveyance and transfer of property—real and personal, and providing remedies for injuries to persons and estate, and other similar acts which would be valid if emanating from a lawful government, must be regarded in general as valid, when proceeding from an actual though unlawful government; and that acts in furtherance or support of rebellion

against the United States, though intended to defeat just rights of citizens, and other acts of like nature, must in general be regarded as invalid and void."

And it is even more forcibly expressed in Horn vs. Lockhart, 17th Wallace, 580, in these words, viz:

"We admit that the acts of the several States in their individual capacities, and of their different departments of government, executive, judicial and legislative during the war, so far as they did not impair or tend to impair the supremacy of the national authority, or the just rights of citizens under the Constitution, are in general to be treated as valid and binding. The existence of a state of insurrection and war did not loosen the bonds of society, or do away with civil government, or the regular administration of the laws. Order was to be preserved, police regulations to be maintained, crime prosecuted, property protected, contracts enforced, marriages celebrated, estates settled, and the transfer and descent of property regulated precisely as in time of peace. No one that we are aware of seriously questions the validity of judicial or *legislative* acts in the insurrectionary States touching these and kindred subjects, where they were not hostile in their purpose or mode of enforcement to the authority of the national government, and did not impair the rights of citizens under the Constitution."

But at the date of the Gorlinski sales, the military government which had been established in the State had been superceded and supplanted by the civil government which was organized and set in motion under the Constitution of 1864; and which has since been uninterruptedly and continuously maintained.

Hence a very different condition of things confronts us from the one counsel for the defendant railroad company supposes to have existed; and Gorlinski, Register, had the legal *status.* of Dupre, Register, or any other officer of the civil government which had then been completely established in Louisiana.

Recurring to the propositions of defendants' counsel, that Act 267 of 1861, repealed, by implication, Act 290 of 1855, and abolished the office of register of the State Land Office, and created instead thereof that of commissioner of public lands; that in consequence thereof Gorlinski had been appointed by Governor Wells to an office which had at the time, no existence; that therefore, conceding the regularity of his appointment and installation in office, he was without legal power

to perform the acts he did in attempting to sell lands of the State government to the plaintiffs; and that his lack of power and authority in law struck with absolute nullity his acts as register of the Land Office, we have this to say: That the latter statute prescribes, in its first section, "that there shall be an office for the sale of the unlocated public lands of the State of Louisiana donated to the State by Congress, which office shall be administered by a register", etc.

The former statute prescribes in its first section "that there shall be established at the seat of government of the State a general land office, the chief officer of which shall be called the commissioner of public lands", etc.

The language of this section, taken alone, might be susceptible of the interpretation counsel has placed upon it; but when it is considered in connection with the following section, we think it apparent, that they have claimed too much for it.

The second section of the alleged repealing law provides, "that the said commissioner shall, from time to time, give such instructions to the several registers and receivers, relative to the government of their offices, as he may deem proper," etc.

We are of opinion, that a fair interpretation of the language of this section of the statute indicates the purpose of the Legislature to have been, to create a new and additional office, that of commissioner of public lands, and to make him the *chief* officer of the land department, and give him control of and *supervision over the registers and receivers* of the different State land offices; and that it left their offices and their tenures of office in *statu quo,* and in no respect interfered with.

Indeed, section ten provides for the appointment of registers and receivers; and the whole act clearly shows that it was intended to create a general land office, somewhat on the plan of that at Washington, D. C.—giving supervision over district land offices and land officers to the commissioner of public lands.

This conclusion is, in our opinion, plainly deducible from the quoted provisions of the act.

We ascertain from the record, that there was an acting commissioner of public lands in office, discharging the duties of that office, during the existence of the war; but since the re-establishment of civil government in Louisiana, under the Constitution of 1864, there is no evidence of such an officer having been engaged in the performance of the duties thereof. On the contrary, the evidence discloses, that

since the date of the re-establishment of civil government, all sales and entries of public lands have been made by a *register of the land office,* without the intervention or co-operation of a commissioner of public lands.

On this hypothesis, the acts of Gorlinski, as register of the land office, are not absolutely null and void, but entitled to full faith and credit.

But let it be conceded, for the argument only, that Act No. 267 of 1861 did repeal Act 290 of 1855—and, in point of fact, it purports to repeal "all laws or parts of laws contrary to or inconsistent" therewith and no others—and the conclusion must be the same.

From a careful inspection of the first section of the Act it appears, that the office of the commissioner of public lands which that statute created was established at the seat of government.

The seat of the State government was, by the Constitution of 1864, established at the city of New Orleans. Article 130, Const. of 1864.

The only duties which that statute imposed upon the commissioner of public lands were, to take charge and have the custody of the books, records, maps, field notes and effects of the former United States Surveyor General of this State, and of the land office at Baton Rouge; and such others as may be prescribed by law. *Id.,* Section 1.

That, amongst the latter was the requirement, that he should, from time to time, give such instructions to the several registers and receivers as may be appointed thereunder relative to the government of their offices, as he may deem proper; and to receive all their returns, and decide upon all appeals taken from their decisions.

*Ibid,* Section 2.

That statute provided, that the commissioner of the general land office should be appointed by the Governor. *Id.,* Section 4.

It, also, provided "that there shall be a register and receiver appointed and commissioned by the Governor * * * for each of the land offices of the State except the general land office, etc." *Id.,* Section 10.

It, also, provided "that the several registers and receivers appointed under this act, shall receive and take charge of all the maps, books, papers, patents, furniture, etc., of the several land offices of the late United States, etc." *Id.,* Sec. 12.

It, also, provides, "that for the sale of the public lands, the State is divided into five land districts, corresponding and being the same as

the several land districts of the late United States, and a State land office established at each place where the late United States had a land office." *Id.*, Sec. 13.

It also provides "that all lands belonging to or claimed by the State, shall be sold and disposed of at the land office of the district in which the land may be situated." *Id.*, Sec. 14.

From the foregoing analysis it is clear, that the commissioner of public lands was not authorized to make sales of public lands, as that statute had confided that power upon the registers, *exclusively*. It is equally clear, that the Governor was authorized to appoint a register for each district, and at each place where the United States government had established a land office.

In 1864, there was a United States land office at New Orleans, Louisiana, which had jurisdiction over the public lands within that portion of the State lying south of the thirty-first parallel, and southeast of Red river.

U. S. Rev. Stats., Sec. 2256, No. 10.

The proof shows, that after Gorlinski's appointment on the 29th of July, 1864, he established his office in New Orleans, and all his sales were of lands within the area of country adjacent thereto; and that those he sold to the plaintiff are situated therein.

The Governor of the State of Louisiana, within which civil government had been re-established—at least within the city of New Orleans and the territory adjacent thereto—had, at that date, the undoubted authority to appoint Gorlinski register of the land office in the New Orleans district; and he had ample authority to exercise the power vested by law in a register, to dispose of public lands of the State within that district, and to issue certificates therefor.

And the record fully attests, that that is just what Gorlinski, register, did.

Possessing the power to appoint a register of the land office, under the Act of 1861, for the land district, conforming to the land district of the United States embracing the city of New Orleans and adjacent territory, the appointment as made, strictly conforms thereto; quite as much so as it does to the Act of 1855—the power and authority of the register under either the Act of 1861 or 1855, being equally great within the designated territory.

It is not contended, nor does the proof disclose, that any other person was exercising, or claiming the right to exercise authority within

that district, as register of that land office under the provisions of the law of 1861. But the record does show, that both Gorlinski, register, and Ad. Dupre, his successor in office by virtue of the Governor's appointment, did make sale of a vast quantity of public land to purchasers in good faith, such as plaintiffs were, the money for which actually went into the State treasury.

Dupre, register, in his report, places the quantity of land which Gorlinski, register, sold, at 43,207 acres, and same have been in commerce for thirty-five years. In our opinion such titles are valid and binding on the State; and that this court should protect them.

The only remaining contention of the counsel for the railroad company which requires consideration is, as to what effect is to be given to the provisions of the joint resolution No. 25, which was adopted on the 16th of June, 1863, which, in effect declared, that "all lands within the State then subject to entry, or location, should be withdrawn from market, and should not be disposed of until twelve months after the end of the then existing war."

Giving to that resolution a liberal construction and its widest possible effect, we think it can be considered only to have exercised a restraint upon such State officers as adhered to the State government which had seceded from the Union, and by which it had been promulgated as a law.

Had this litigation presented the question of the validity of a sale or entry by an officer of that government, prior to the re-establishment of civil government under the Constitution of 1864, in violation of that prohibition, a very different view might be taken of it; but we are now called upon to say, that said resolution had the effect of restraining officers of the rehabilitated government from disregarding its provisions.

It is a well-recognized principle, and one which has been sanctioned by many decisions of the Supreme Court, that, when the city of New Orleans, and the territory contiguous thereto, became subjected to the domination of the Federal army of occupation in 1862, the ordinary civil authority of the State necessarily ceased, and gave way to such measures as the military government therein established, saw proper to adopt.

Grapeshot, 9 Wallace, 129; Handlin vs. Wickliffe, 12 Wallace, 173; Burke vs. Miltenberger, 19th Wallace, 519; Mechanics' Bank vs. Union Bank, 22nd Wall., 276.

Betz et al. vs. I. C. R. R. Co. et al.

As well illustrating the condition of things under the military government in Louisiana in 1864, and the character and extent of its dominion and control within the territorial area of its operaton, over civil matters, the case of Lanfier vs. Mestier, 18th Ann., 497, may be cited.

The object of that suit was to annul a judgment which was rendered in June, 1864, by the Fifth District Court of the city of New Orleans, on the ground that the judge was incompetent to decide it.

In the course of their opinion the court said:

"At the time of the rendition of the judgment sought to be annulled, the city of New Orleans was under the complete dominion and absolute control of the Federal military authorities. The government established by them recognized no law but such as met its unqualified approval and sanction. It not only prescribed the rule for the inhabitants of the conquered city, but established a judiciary, appointed judges, whose judicial functions were exercised under its supervision."

That decision was rendered by the court which was organized under the Constitution of 1864.

In Mechanics' and Traders' Bank vs. Union Bank, 25th Ann., 387, the court stated the reasons on which that principle rested, in terms more exact, viz: "When the United States captured the city of New Orleans, in 1862, the civil government existing under the Confederacy, *ceased to have authority.* As an incident of war powers the President had the right to establish civil government, to create courts and to protect the lives and property of the people."

That decision was rendered by the court which was organized under the Constitution of 1868.

The Supreme Court of the United States, in December, 1864, decided in The Venice, 2nd Wallace, 258, that the military occupation of the city of New Orleans became effective on the 6th of May, 1862.

Under this condition of things the aforesaid joint resolution was wholly without efficacy to restrain or control the action of officers of the military government which the President appointed in Louisiana, *or* those of the civil government which was thereafter established under the State Constitution of 1864.

Not only is this true as a matter of jurisprudence, attested by contemporaneous history, but the evidence in the record shows, that the several local land offices in the State did not regard that resolution, *prior* to the re-establishment of civil government under the Constitu-

tion of 1864; for Ad. Dupre, register of the State land office, in his report to Governor Wells, in November, 1865, makes the statement, "that there is accompanying same a list taken from the monthly and quarterly returns of the late registers and receivers of all the lands sold by them at the several district land offices from the 1st of January, 1861, to the 31st of December, 1864, comprising high-lands * * * swamp lands", etc.

Reference to the accompanying list discloses that there were disposed of, between the dates specified, the vast amount of 102,098 acres of swamp and overflowed lands, of the quality of those involved in this suit, at $1.25 per acre, and for which the State realized $127,623.08.

That report embraces the date at which Gorlinski made sale to the plaintiffs and their ancestors.

On careful consideration of counsel's argument and the evidence and jurisprudence bearing on the question, our clear conviction is, that the joint resolution which was adopted by the legislature of 1863, suspending sales and entries of public lands had no restraining power, or effect upon the officers of the land department of the State government of Louisiana as it was organized under the Constitution of 1864.

### III.

Having disposed of the contentions of counsel for the defendant railroad company upon which they rested the charge of illegality in plaintiffs' title by purchase from Gorlinski, register, and adversely thereto, we have only to apply the authorities and state our conclusions therefrom.

As in Cole vs. Thompson, *supra*, both parties claim to have derived title from the State, the plaintiffs under an entry without a patent, and the defendant under a sale and patent of later date.

In such a controversy the defendant carries the burden of proof, and is bound, by a clear preponderance of the evidence to substantiate its charges against the plaintiffs' title, notwithstanding its own is founded upon a patent.

In that case the court said:

"The plaintiff's title being the oldest, must prevail unless successfully impeached."

In Simien vs. Perrodin, 35th Ann., 931, the court held that the title to public lands "dates from the certificate and not from the patents."

In Broussard vs. Pharr, 48th Ann., 230, a contest was presented between two parties holding patents to same land of different dates, and we maintained that of later date, because it was shown to have been founded upon "prior location" and certificate.

The contention of defendants' counsel is, that in such an action as this, the patent furnishes *prima facie* evidence that a fee simple title has passed to the patentee, and that the plaintiff claiming under a warrant prior in date must show that the patent is void for want of title in the State at date it was issued; and in support of that proposition they cite numerous authorities.

That proposition is correct, but is confined to that class of cases in which the rival claimants base their demands upon *the same entry*— the patent having apparently issued to the *transferree of the warrant* and in a different name from that of the original warrant holder.

Helluin vs. Minor, 12th Ann., 124; Pontalba vs. Copeland, 3rd Ann., 87.

But applying that rule to the instant case, we are of opinion that the plaintiffs have made their title clear by a fair preponderance of the evidence.

It shows, that the swamp and overflowed lands which are situated in township nine south of range eight east, were surveyed and identified in 1858; and that they became segregated from the public domain and liable to sale, or entry, as property of the State under the granting act of Congress.

That in consequence thereof, the State had the right, through a competent officer, to subsequently make a sale of same and to evidence such sale by proper certificate, or warrant.

That on the 28th of October, 1864, Gorlinski as register of the State land office, did make a sale to Nicolas Betz, and his associates, the plaintiffs in this suit, of the property involved therein and issued a warrant therefor.

That said officer was regularly appointed, commissioned and qualified under the civil government which was established under the Constitution of 1864, which had supplanted and taken the place of the military government which the President had inaugurated in 1862.

That Act 267 of 1861, did not repeal Act 290 of 1855, which established a State land office for the government and sale of the public lands; but created a general land office, and a chief land officer, who

had supervisory control and superintendence over registers and receivers.

That the joint resolution No. 25 of 1863, suspending sales and entries of public land until one year after the close of the war, operated no restraint upon land officers of the civil government which had been established under the Constitution of 1864.

Finding these propositions sustained by the record and the authorities, it is our opinion, that the State erroneously issued patents to Howcott, and that the defendant railroad company is without any title to the land in controversy.

It is therefore ordered, adjudged and decreed that the judgment of the lower court be and the same is annulled and reversed; and it is now ordered and decreed, that the plaintiffs have and recover the property in dispute and be placed in possession thereof, and that the defendants be taxed with all costs of both courts.

Mr. JUSTICE BREAUX takes no part.

Mr. JUSTICE MILLER: I dissent.